JAMES CASEY, PLAINTIFF IN ERROR, V. THE STATE OF NEBRASKA, DEFENDANT IN ERROR.

1. **Homicide:** CIRCUMSTANTIAL EVIDENCE.  Where it is sought to establish homicide by circumstantial evidence, the circumstances when taken together should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused, and no one else, committed the offense charged.

2. ———: ———: FAILURE OF PROOF.  It is not sufficient that the facts create a probability, though a strong one.  If, therefore, assuming all the facts to be true which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of the accused, the proof fails.

3. ———: ———.  It is essential that the circumstances, taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis.  *Com. v. Webster*, 5 Cash., 319.

4. ———: ———: CUMULATIVE EVIDENCE.  Evidence of distinct and independent facts of a different character, though it may tend to establish the same ground of defense, is not cumulative within the rule.  *Walker v. Graves*, 20 Conn., 305. *Barker v. French*, 18 Vt., 460.

5. **Indictment:** SEPARATE COUNTS: VERDICT.  Where *distinct* offenses are charged in separate counts of an indictment, the jury must either return a general verdict of not guilty or respond to each charge in their finding.  *Wilson v. State*, 20 Ohio, 26. *Williams v. State*, 6 Neb., 343.

ERROR to the district court for Gage county. Tried below before BROADY, J.

*W. H. Ashby* and *Pemberton & Bush,* for plaintiff in error.

1. When distinct offenses are charged in seperate counts of an indictment, the jury must either return a general verdict, or else respond to each charge in their finding; especially where the offenses charged are made separate and distinct by statute, and subject to different degrees of punishment. *Hurley v. State,* 6 Ohio, 404. *Wilson v. State,* 20 Ohio, 26. *Buck v. State,* 1 Ohio St., 61. *Riflemaker v. State,* 25 Ohio St., 395. *State v. Behimer,* 20 Ohio St., 572. *State v. Sutton,* 4 Gill, 494. *State v. Commissioners, etc.,* 3 Hill (S. C.), 239. *Marshall v. Com.,* 5 Grat., 663. *State v. Redman,* 17 Iowa, 329. *State v. Arthur,* 21 Iowa, 322. *Ray v. State,* 1 G. Greene, 316. *Webber v. State,* 10 Mo., 4. Grah. & W. New Trials, §§ 140, 1390. *Williams v. State,* 6 Neb., 334.

2. Shooting with intent to kill can only be predicated on a shooting, the intent of which failed. *Foster v. People,* 50 N. Y., 598. *People v. Rector,* 19 Wend., 608. *State v. Hammond,* 35 Wis., 315, 320. *Pliemling v. State,* 46 Wis., 522, 523. *Smith v. State,* 2 Ohio St., 513.

3. Declarations or acts succeeding closely upon the transaction, and growing directly out of it, are admissible as part of the *res gestœ.* Whart. Crim. Ev., § 262. 1 Greenl. Ev., § 108. *State v. Tweedy,* 11 Iowa, 350. *State v. Montgomery,* 8 Kan., 351. *Allen v. Duncan,* 11 Pick., 309, 310. *Mitchum v. State,* 11 Ga., 615. *Handy v. Johnson,* 5 Md., 450.

*William Leese,* for the state.

Where an indictment contains two or more counts, and the defendant is found guilty on one count, and the ver-

dict contains no finding as to the other counts, this silence of the verdict is equivalent to an express acquittal of the charge in the other two counts. *Beaty v. State*, 82 Ind., 228. *State v. Hays*, 78 Mo., 600. *Stuart's Case*, 28 Grat., 950. *State v. Whitton*, 68 Mo., 91.

MAXWELL, CH. J.

The grand jury of Gage county found an indictment against the plaintiff, in the first count of which he is charged with manslaughter; in the second, with stabbing one W. H. Mc'Elhaney with intent to kill and murder, and in the third, with stabbing said McElhaney with intent to wound. On the trial of the cause a verdict was returned as follows: "We, the jury in this case, being duly impaneled and sworn, do find and say that the defendant is guilty as charged in the third count of the indictment." The plaintiff was thereupon sentenced to imprisonment in the penitentiary for thirteen years.

A large number of errors are assigned, among which it is alleged that the verdict is not sustained by the evidence; that there is newly discovered evidence, and that the verdict does not pass upon the first and second counts of the indictment, etc. Those deemed important will be considered in their order.

1. That the verdict is not sustained by the evidence. The testimony as set forth in the abstract is as follows:

Dr. Charles Gafford testified, and described the wounds, and in answer to the 7th int. says that the wound in the breast is the only one that was fatal. The breast was full of blood, and in turning the body over the blood gushed out of that wound. There was some blood on the clothing.

This wound, as all the rest, ranged from the right side towards the left. The blows making the wounds were all directed from right to left.

Dr. Given testified to the same effect, adding that Mc-Elhaney's clothes were saturated with blood.

A. D. McCandless testified:—On the night of Nov. 15th, 1884, saw McElhaney and the defendant, Casey, at the opera house saloon in Wymore, Gage county, Nebraska. McElhaney and defendant were standing at the bar. I heard Mc. tell Casey they had buried the hatchet the third time, and he wanted him to leave it buried. They took a drink together. Ten or fifteen minutes after this Casey went up to Mc. and began to talk about trouble they had had prior; had some words and then went up and took a drink. Mc. told Casey the hatchet was buried, and if he brought it up again he would paralyze him. They came together again; Mc. took hold of Casey and pushed him back. About this time the saloon keeper told Casey he must go out, which he did. *McElhaney followed Casey out.* They got hold of one another almost as soon as they got out. Mc. got Casey by the breast, and threatened to paralyze him. The night-watchman came up. Mc. took hold of him with one hand and Casey with the other and bumped them together. I asked the watchman to let Mc. alone and not attempt to make any arrest. He let go and stepped back, and Mc. threw Casey down. This was south of the saloon door. Mr. Linton was there, and we both insisted on Mc. letting Casey up. He got up, lifted Casey to his feet and let go of him. They were apart not over a minute until Casey walked up to him again. Mc. again threw him down; this was north of the saloon door, and over a grating in the sidewalk. One of Casey's legs went through the grating. Linton and I told Mc. that Casey's leg was in a hole and liable to be broken. We tried to get Casey's leg out. Mc. raised up as though he was getting up. He had his hand on Casey's breast. He had been sitting on him, but got up partly, then dropped back and struck Casey in the nose; then changed hands and struck him again. Casey was lying on his

back.   When Mc. was striking Casey, John Bagley came up and said it was a 'damned shame to see an old man pounded up that way.   Mc. rose off from Casey and says " What is that," and made a spring for Bagley.   Mc. and Bagley both went around the corner of the saloon.   The next I saw of Mc. he came from the north side of the building; was out about ten feet from the building; he walked up very slowly to a point about north-east of the building, and was standing there when Casey came from the south, past me, and walked up to him, throwing his arm around his neck and got him by the collar and commenced striking.   Mc. backed off, and as he backed off he doubled up.   Mc. said, "He is cutting me to pieces with a knife."

### CROSS-EXAMINATION.

Casey never offered to strike Mc.   He wanted to talk. I told Bryant he had better not try to arrest Mc.   I thought he would not let him.    When Mc. was on Casey he sat straddle of him on his knees.   When Mc. and Casey met the last time, Casey struck underhanded blows.   When Mc. had Casey down he told him that he could paralyze him.   Casey said he knew he could.

W. A. Linton testified :   After Mc. and Casey got out of the saloon Mc. got him down twice.   Mc. jumped off of Casey and started around the corner after Bagley.   They got into a scuffle around there.   I went around.   It was dark.   Some one said, " Come, old man, I have got him. I have him down ; come and give it to him."   The police-man separated them.   The scuffle around the corner lasted from one to three minutes.

### CROSS-EXAMINATION.

Afterwards I found blood on the sidewalk around the corner where the scuffle was.   I think there was three in the fight around the corner, and I found the pool of blood

right where the scuffle took place. I don't think Casey was in the row. When they met after the row around the corner, Mc. did not do much of anything. He did not seem to be Mc. He was a good man, and if he was himself he would not stand and let somebody strike him. When he had Casey down he struck him several times before he went around the corner. He handled both Bryant and Casey easily.

H. A. Bryant testified: Live at Wymore, Gage county; was there on the night of November 15, 1884, and saw affray between Mc. and Casey. Casey says, " Don't want any trouble with you." Mc. says, " Shut up, then, God damn you, or I will paralyze you." Casey says, " I am an old man, and don't want to fight with you." Mc. says, " Well, shut up, then, God damn you, or I will paralyze you." He says, " Well, Mc., let's quit; let's go in and have a drink." Mc. took both hands and pushed Casey against the window. Casey says, " Mc. I don't want to fight you, you are a better man than I am." He says, " Shut up, then, God damn you, or I will paralyze you." He says, " You are a better man than I am." At that he fetched him a swing, and as Casey came around, he stepped on that grating lengthwise, and it broke and let him in. Mc. struck him in his forehead, and Casey had his left hand to ward off the blow, with his right hand by his side; Mc. had Casey with his left hand in his breast or coat, and Casey straightened his arm by his side; Mc. said, " Oh no, you don't come that, old man;" he let go quickly with his left hand and took hold of Casey's hand and fetched it up across his stomach; then he struck him two, three, or four times in the nose—fearful blows—he had the leverage of his arm; and at the same time a voice came from the right, saying it was a damned shame. Mc. jumped up, left Casey, and started for the man on the north. The first that transpired there I did not see. The next I saw was around the corner. Some one said, " Take

him off;" Mc. said, " No, let him alone, I will take care of
him." Foley came along and says, " Quit this rumpus."
The crowd scattered; Mc. got on his feet a few feet from
me, while Casey was standing within three feet of me on
the north. Mc. came directly toward Casey, and as they
came up within a few feet of each other, Mc. first straight-
ened up and raised as he run toward Casey, and Casey
struck with his right hand. The first blow he struck, Mc.
says, "Take him off boys, he is cutting me to pieces."
They both fell off the sidewalk, one went one way, and
the other the other. Casey, I think, struck him four or
five times, and the last time higher than at any other time.
As he struck the first blow, Mc. dropped lower. He
struck Mc. first, I think, in the groin or abdomen. The
others were higher up. The last blow, I think, struck
him in the breast, and they both fell off the sidewalk to-
gether. Mc. came up in a stooping position, and each
time Casey struck him, he dropped lower and back some
three steps.

CROSS-EXAMINATION.

I stepped around the corner in the dark, and there the
fight was going on. There were three men that were loud
and boisterous. Foley stopped the fuss there. Mc. had
made two or three struggles to get up. Bagley was the
man he was fighting with. Bagley was on top of him;
Bagley's head was in different positions; Bagley was not a
very large man. He was a little fellow, weight about 120
or 125 pounds. The most of the time Bagley was on top
of Mc., holding Mc. down. Mc. was a strong muscular
man; he was more than ordinarily so. He was accustomed
to fighting and a hard man to handle. Bagley remained
on top until Foley came and broke it up. Mc. was mak-
ing efforts to get up, but he didn't do it until Foley scared
this fellow away. The first I saw of Mc. he was lying on
his back, his head near the corner of the building, and
Bagley on him, and that was soon after Mc. left Casey.

Soon as I got Casey out of the grate, I went around to see where the difficulty was. I only had to go a few feet— likely six or seven. It didn't take me long.

B. G. Davis testified: I reside at Wymore; am acquainted with the defendant, James Casey. It was on Saturday night, two weeks before this thing occurred, I saw Casey a little under the influence of liquor, and I asked him not to take any more, and he replied that he would just as soon get full as not; that he had it in for Mc.

#### CROSS-EXAMINATION.

Mc. had been choking Casey before that.

Wm. Hackley testified: Reside in Wymore; was there on the night of November 15th, 1884. I examined the grating and ground under it by the saloon, and found blood in two places. There was a pool of blood under the grating, and around the corner was another pool of blood. It seemed from what I could see around here, blood showed on the walk, and it scattered around; this here had dropped down on the earth and formed a pool. Right under the grating next to the wall, was the pool of blood; around this corner was another pool of blood on the sidewalk.

#### CROSS-EXAMINATION.

Blood had run through the grating.

J. N. Ray testified: (Defendant objected to this witness, as his name was not on the indictment. Objection overruled). I found a knife about five days after this affair—thirty feet from the corner of the opera house. I have the knife.

John Bagley testified: I was in Wymore the 15th of November, 1884. I know of Mc. being cut there that night. I didn't do the stabbing or see any one do it. I never saw Mc. or Casey before in my life that I know of. When I said it was a shame to see an old man beaten like that, Mc. sprung for me, and I ran around the corner and

I bumped against some one, and he caught me. He had me by the coat and I was trying to get away from him. He was larger than me and could do what he wanted with me, and I thought my chance was to trip him. I turned quick, caught him by the waist and tripped him, and he fell on his back. Soon as he was down he was up again. Soon as I knocked him down, I tried to get away from him.

His head was between my legs; I got one leg loose and was kicking to get loose, and some one gave him a kick, and the officers came and he let me loose and I went away outside the crowd. When I had him down there was some one around him. When he was there some one kicked him.

### CROSS-EXAMINATION.

When the officer came I went west. I stood there a while; can't say just how far I did go; I can't say where Fitzgerald was standing. I don't know where Casey was. I don't know who kicked him; I was standing over him. I am nineteen, going on twenty. I live at Shenandoah, Penn. I came to Nebraska last May. I did not strike Mc. at all; I just threw him down. He struck at me; just as quick as I saw him fall I turned to go away. Foley came from the west, I believe. I went to the west.

State rests.

John Gallagher testified: Reside at Wymore, Gage county. Was living there on the 15th of November last. I saw the difficulty that ended in the death of Mc. Casey and Mc. had a few words, and they took hold of each other and scuffled. Mc. told him he could paralyze him. Casey told him he knew it; he asked why he did not go away and let him alone. They kept talking to each other. Bagley made some remark, and Mc. let go of Casey and made one step back to the corner, and there was Bagley. As Mc. stepped forward some one struck him. I could not see who it was. Mc. groaned at the time. Casey was helped up and I think he went toward Mc. Mc. came

around from the corner and appeared weak. Bagley stepped around and said he had done him up, now come on, it was his time. Casey went that way. Casey's nose was bleeding. His nose looked the next morning as if it had been pinched. When Mc. started for Casey I can't say how far he did go before some one struck him. I seen the man, or something, and then I heard a groan. At this time Mc's. back was in the light, but his face was in the dark just at the corner. I was subpœnaed here last term in the case of the State vs. John Bagley, to testify on behalf of the state.

RE-DIRECT EXAMINATION.

Q. State whether or not you have been employed by the prosecution in this case to hunt up testimony?

Objected to as immaterial, irrelevant, and incompetent; and furthermore to Mr. Ashby making statements to the jury unless he is put under oath. Sustained.

John McMullen testified: Live in Wymore; was living there on the 15th of November, 1884. Was present at a difficulty which ended in the death of Mc. He said, "Casey, I want you to go home, or I will paralyze you." Casey says, " Mc., I don't want to go home just now, and I know you are a better man than I am; you can paralyze me if you want to; but there is nothing between us to make rows in that way." Mc. took hold of Casey and shook him a little and laid him down on the sidewalk, and then let him up; took hold of him again, and about that time Bryant came around and asked Mc. to let go of him and he would try and get Casey to go home. Mc. gave both of them a shaking, rubbing Casey's nose with his fist. Casey didn't seem to be angry, he didn't seem to think Mc. was going to hurt him. Mc. hit him twice or three times in the face. Just then some little fellow standing in front of the window on the stone said it was a damned shame a crowd of men would stand around and see an old man abused in that way. At that Mc. sprang off Casey

and made for the little fellow. The little fellow jumped around the corner and that is the last I saw of him until I saw Foley, the policeman. He told them they would have to quit or he would arrest them. Meantime Casey got up and I think went south. When Mc. went around the corner I heard no noise. I heard somebody say, "Give it to him, Johnnie, we won't see any son of a bitch hurt you, while we are around."

### CROSS-EXAMINATION.

I saw Mc. after he came out of the difficulty with Bagley. I saw him come out of the darkness and Casey run up toward Mc. and I think took hold of him with his left hand and made three or four underhand strokes with his right hand. Mc. was bent over. I don't think Mc. said anything.

### RE-DIRECT EXAMINATION.

I heard Mc. say nothing while they were around the corner. My memory is not fresh whether I heard him say anything or not.

Q. Did you hear the sound of a voice you thought was Mc's. say, " Boys, take him off, I have got enough?"

Objected to as leading. Sustained.

I heard nothing more than some one say, "Give it to him, Johnnie." I can't remember to-day whether I heard any one say " Boys, take him off, I have got enough," or not. I have forgotten a good many things since then.

Thomas O'Harra testified: Live in Barneston, Gage county. Was in Wymore the 15th of last November. Was present at the difficulty that ended in the death of Mc. I saw him strike Casey several times with his fist and blood came from his nose. Some men were trying to get his leg out of the railing. I made the remark to Bryant and Linton that it was a shame, they ought to part them. They said Casey was drunk. I said I was aware of that and so was Mc. Then Mc. turned around and said, "God

damn you, do you want me to paralyze you?" Then some one on the north made the same remark and he made for that party. I heard a racket around the corner. I could not say what condition Casey's face was in exactly, it was covered with blood; he was bewildered, and I told him he ought to go home; he says, "Yes, I want to go home." I took him by the coat collar and told him to come to the barn and wash the blood off. He went a few steps, crying; he said he was killed, or hurt, and dropped down and could go no further. The city marshal hallowed to me and asked if I knew where Casey was. Casey was lying on the ground. He said, "Get a team and take him home." I got my team and took Casey home. His face was badly bruised up and was bleeding. I cannot say how much blood there was at the grating. While Mc. had Casey down he made no effort to fight. I heard him say, 'Bill, don't strike me, you are a better man than I am," to Mc.

CROSS-EXAMINATION.

Can't tell what time of night it was. I saw Casey in the saloon. I saw the beginning of it in the saloon. There was a one-armed man struck Casey in the face—didn't make any mark—didn't make it bleed any. Mc. said, "God damned son of a democrat." The bar-tender shoved Casey away. Casey didn't strike back. Casey said on the sidewalk, "Bill, don't strike me." I remember that distinctly, that is all I remember. I heard Mc. say something about burying the hatchet. I remember Casey said, "Bill, don't strike me, you are a better man than I am." At this time I was standing by McCandlass. Casey was trying to ward off Mc's. fist. After they came outside Mc. had hold of him, by the window. Casey didn't do anything to get away. Think I heard Mc. tell him to go home and let him alone, but had hold of him at the same time. Could not see as Casey had any chance to get away. Mc. was chucking him against the window. I didn't try

to help him up. There was a crowd around. I saw what was done. Casey was trying to get his leg out. He was warding off the blows with his right hand. The other I could not see. Mc. struck him four or five blows in the face, and the blood came. Struck him pretty hard. Casey didn't try to do anything that I could see. Don't think Mc. had any cause for striking him. Didn't see Casey do or make any effort to do anything to Mc. I took Casey home that night.

### RE-DIRECT EXAMINATION.

There was a great crowd there surging back and forth. When Mc. sprang off Casey I retreated back and the crowd pushed off the sidewalk on the east side.

. Wm. Gillispie testified: Live in Wymore, and lived there the 15th of November, 1884. I saw Casey on that night. . I found him between the livery stable and the saloon, south-east of the saloon. He was lying in the street; his face was bloody and dirty—his nose was bloody. I saw him the next day; his nose and lips were bruised; his nose was swollen. The hide was broken on the bridge of his nose.

### CROSS-EXAMINATION.

I didn't notice his hands—didn't notice his clothes. This was after the fuss.

Joseph Foley testified: Live in Wymore. Was there on the night of the 14th of last November. Was special police there. I came along the north side of the building from the west. Mc. was down and there was a man, John Bagley, partly bent over him and they separated in a minute after I got there. Don't know exactly the position Mc. was in. The young man was backing away; he was leaning west. Several others were there. When Bagley left Mc., Mc. raised up and he looked to me to be hurt; he raised up slow. I noticed something peculiar in his conduct. The peculiarity was that he didn't make

any efforts to fight, and disappeared.  Mc.'s head was in that space between the corner of the saloon and the railing. Had some talk with the young man afterward as to what he was doing.

Q.  What did he say then?

Objected to as immaterial, irrelevant, incompetent, and no ground laid for impeachment, and as hearsay.  Objection sustained.  Defendant excepts.

The marshal and I arrested Bagley that night.

· Q.  What did you arrest him for?

Objected to as immaterial, irrelevant, and incompetent. Objection sustained.  Defendant excepts.

Defendant's counsel offered to prove by this witness that at the time he arrested John Bagley he said, " Yes, I done the son of a bitch up, and I can do it again."

Objected to as immaterial, irrelevant, and incompetent. Objection sustained.  Defendant excepts.

Mrs. Winnefred Casey testified :  I am the wife of James Casey. ' When Casey was brought home his nose and face was bruised and had been bleeding.  He appeared to be helpless.

James Casey testified :  I am the defendant in this cause. I resided in Wymore last November.  I didn't have any knife on the 15th of November last.  I did not cut Mc.

### CROSS-EXAMINATION.

I first saw Mc. in the saloon.  We drank a glass of beer, and Mc. said something about a hatchet and seemed angry. I was not angry—not at all.  I had been drinking some, but remembered what was going on.  Have not a distinct recollection of what was going on.

Q.  Is it not a fact that you had been drinking and did not know what you were doing?

Objected to as not proper examination.  Objection overruled.  Defendant excepts.

I remember meeting Mc. when I went into the saloon.

I did not know what I was doing.    I was drinking some
—yes, I was drunk.    I can remember things pretty well
sometimes when I am drunk.    Think I remember at this
time until I got out doors.    I remember what occurred
outside the door.    Remember I did not get angry at all;
did not strike Mc. that night; don't think I took hold of
him.    Didn't have a knife that day nor the day before.
Didn't carry a jack-knife of any kind.    Sometimes I use
tobacco and use a knife sometimes to cut it.    Sometimes I
carry a knife.    I have no knife now and didn't have at
that time—never had one like that—never saw one like
that—am positive about that.    Remember I got my leg in
the grate—don't remember who took it out.    I don't re-
member what I did when it was taken out.    I know I
did not cut Mc.    No one gave me a knife.    I don't re-
member what occurred.    Don't remember of Mc.'s hollow-
ing "They are cutting me with a knife;" don't remember
of being on the corner.    Don't remember of falling down
on the street.    Don't remember of walking quickly by the
postoffice.    Don't remember anything about that after I
got out of the grate.    Know I never cut him; never
thought of it—didn't have any grudge against him.    I did
have difficulty with him once.    It is a fact he shook and
knocked me down.    I never made the statement I "had it
in for him," I know.    I forget whether I said I was hurt
out on the street or not, don't remember anything of that
kind now.    I remember Bryant's testimony, remember of
his testifying that I run my hand down by my side and of
Mc.'s telling me "No, you don't come that."    Don't think
I run my hand down by my side.    I did not strike him
nor strike at him at all—did not have hold of him nor did
not strike any underhand licks on the corner—don't re-
member of having hold of him on the corner; don't think
I went out to the corner.

Wm. Hackley testified:    Was acquainted with McEl-
haney, the deceased.    His physical strength was more than

an ordinary man; was a man of a great deal of courage to carry out his point—determined—in regard to his fighting qualities, when he was not in liquor he did not seem to be quarrelsome; but he was a little inclined when drinking to pick up anything quick, and take up anything that came for him.

Defendant rests. Case closed.

The following testimony was taken at the coroner's inquest and introduced as testimony on the trial.

John Thissen's testimony : I had some conversation with Mc. after he was hurt, both at Greenwood's lumber yard and at Givens' office. He said he wanted to see the little fellow revenged and told me to see Deyo and see what could be done; he said he expected to die soon. He said the little fellow cut him in the chest when he was on Casey, and he turned around and he got cut again, and that weakened him. He was in his right mind. He said he was right over the banister in front of the saloon on Casey when he received the cut in the chest. He said it was the little fellow who stabbed him in the breast; he didn't mention his name.

Theodore Angerstien testified : Bagley said it was a d—n shame that so many would stand around and see an old man hurt so. McElhaney then got off Casey and started after him, and the little fellow ran around north of the opera house, and McElhaney after him, and just as Mc. went around the corner this little fellow, I think, am not sure, struck Mc., and Mc. hollowed " Oh, oh," and fell. Fitzgerald said to him, " Give it to him, Johnnie; give it to him." Either the little fellow or Fitzgerald said to Casey, " You man that got licked, come on and give it to him; we have got him down." Mc. said, " Take him off, I have got enough ; " and at that time, or soon after, the policeman separated them, and Mc. clinched again near the N. E. corner of the opera building, and Casey struck Mc. several underhand licks, and Mc. said to McCandless,

"Mac., they are using a knife on me," and Mc. was drawing himself up and backing away from him (Casey).

The above is all the testimony in the case.

It will, be seen that McElhaney was the aggressor throughout, if we except that portion of the testimony relating to Casey striking him, which will be noticed hereafter. McElhaney's abuse of Casey, so far as appears, was entirely unjustifiable, and the blows inflicted by him on Casey's face, while he held him down on the grating, very severe. No one present seems to have had the courage to attempt to interfere; but when a mere boy in years and stature protested against such abuse, McElhaney sprang for him, and overtook him when he was turning the corner of the building. From a plat exhibited on the argument it seems that the saloon in question stands on the southeast corner of a block, and that the front of the building is to the south; that the sidewalk extends across the front and along the east side of said building; that McElhaney was holding Casey down on a grating on the south side of said building, when Bagley, who seems to have been sitting on the water-table under one of the front windows of the building, and in front of McElhaney, protested against McElhaney continuing to abuse Casey. Whether or not Bagley had a knife in his hand or possession at that time does not appear. The boy, however, was attempting to escape; but at the corner of the building being hindered by meeting some one, McElhaney seized him. Finding that he could not escape, he turned quickly and threw McElhaney down. The testimony shows that the light from the saloon windows did not extend east of the building, and that it was dark where this conflict took place. This conflict, as the testimony shows, lasted from one to three minutes, and the strong man, who but a few minutes before was able to take the policeman and Casey and knock their heads together, was held prostrate by a boy, and his whole demeanor changed from that of an aggressive bully to a

peaceable man, as one witness testifies, "When Bagley left Mc., Mc. raised up, and he looked to me to be hurt; he raised up slow; I noticed something peculiar in his conduct. The peculiarity was that he did'nt make any effort to fight." And of another witness, that he "found blood on the sidewalk around the corner where the scuffle was." Also the statement of McElhaney that "it was the little fellow who stabbed him in the breast." We turn now to the testimony which it is claimed shows that Casey struck McElhaney with a knife. There is no proof whatever that Casey had a knife on that occasion. None was found on his person or near where this second scuffle is said to have taken place. The testimony is, that prior to this alleged scuffle McElhaney had ceased his belligerent attitude. All the witnesses testifying upon that point state that he acted as if there was something the matter with him. The wounds, too, it will be observed, all ranged from the right side toward the left. So far as we can gather from the testimony, they were such wounds as would have been given by the backward stroke of a knife held in the right hand of a person pursued, against the pursuer, with the blade pointing backward, and such as could have been given by Bagley when McElhaney was in pursuit of him. Such wounds could not have been given by Casey standing face to face with McElhaney, if he used his right hand, and it is not claimed that he is left-handed, or struck with his left hand; and it is not very probable that McElhaney, if well, would have permitted Casey, without resistance, to stab him at least half-a-dozen times. If we give all the testimony against Casey its greatest possible weight, it does no more than create a probability that he stabbed McElhaney; but this is not sufficient. Where circumstances are relied upon to secure a conviction, they must be of such a character that when taken together they are of so conclusive a nature and tendency as to lead to a satisfactory conclusion, and produce in effect a reasonable and moral cer-

tainty that the accused and no one else committed the offense charged.   It is not sufficient that the circumstances produce a probability, though a strong one.   It is essential that the circumstances, taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis except that of the guilt of the accused.   *Com. v. Webster*, 5 Cush., 319.

Starkie states the rule as follows: " The force of circumstantial evidence being exclusive in its nature, and the mere coincidence of the hypothesis with the circumstances being in the abstract *insufficient unless they exclude every other supposition*, it is essential to inquire with the most scrupulous attention what other hypothesis there may be which may agree wholly or partially with the facts in evidence."   Starkie on Ev. (10 ed.), 863.   *Rex v. Hodge*, 2 Lewin C. C., 227.   3 Greenleaf Ev., § 137, and notes.   The testimony fails to reach that degree of certainty as to exclude every other reasonable hypothesis except that of the guilt of the accused, and is insufficient to sustain a conviction.

2.   Newly discovered evidence.

This evidence is set forth in the affidavit of Jeptha Sturgeon, who at the present time resides in Rush county, Kansas.   He deposes that he is twenty-three years of age, and formerly resided at Hopkins, in the state of Missouri; " that on the 15th day of November, 1884, he was visiting relatives at the town of Wymore, Nebraska; that he saw McElhaney and Casey in the opera house saloon; that he heard them quarreling, and saw the bar-tender put Casey out doors; saw McElhaney follow Casey out onto the sidewalk; saw McElhaney throw Casey down on the grating, and one of Casey's legs went through the grating and tore Casey's pantaloon leg.   McElhaney struck Casey several times in the face and nose, and made the blood flow freely from Casey's nose.   While McElhaney was beating Casey, a little smooth-faced, sharp-faced looking young

man said 'it was too d—d bad to see a young man impose on an old one that way.' McElhaney said to this little fellow something, and jumped up and took after him; the little fellow had been standing up on the water-table of the building, and when McElhaney started after him the little fellow run around the corner of the saloon. Then affiant crowded his way through and went around the corner, and there saw the little fellow on, or rather over, McElhaney, holding him with one hand and striking him with the other. Almost every·lick he struck he said, ' God damn you, will you impose on an old man,' or something of that kind. I turned as quick as I could and said to some one, ' He is cutting McElhaney all to pieces with a knife.' I saw the blade of the knife shining in the hand of the little fellow; I saw him strike McElhaney as he lay on the walk on his back four or five times. I never saw either McElhaney or Casey any more. I afterward learned that the little fellow's name is John Bagley. I left there right away and went home, because I did not want to be detained there as a witness away from home." He returned home on the train next morning after the killing of McElhaney. In this he is corroborated by the conductor of the train.

One Thomas Doyle also makes an affidavit to substantially the same facts as Sturgeon.

It is claimed on behalf of the state that it is apparent that the facts stated in these affidavits are untrue, and that the preponderance is largely with the state. It is also suggested that the evidence is cumulative. The testimony of Sturgeon, who claims to have witnessed the striking of McElhaney by Bagley with a knife, is certainly very material to the accused, as also that of Doyle. In such case the court will not assume that the newly discovered evidence is false. That is a question for the jury to determine. For the purpose of the motion it will be assumed to be true. Neither is such evidence cumulative. There are some exceptions to the rule that a new trial will not be granted for newly dis-

covered cumulative evidence, as where such evidence is sufficient to render clear what was before a doubtful case. *Barker v. French*, 18 Vt., 460. *Waller v. Graves*, 20 Conn., 305. In the case last cited it is said (p. 310): " By cumulative evidence is meant additional evidence of the same general character to the same fact or point which was the subject of proof before. *Watson v. Delafield*, 2 Caines, 224. *Reed v. McGrew*, 1 Hammond, 386. *Smith v. Brush*, 8 Johns., 84. *Pike v. Evans*, 15 Johns., 210. *The People v. The Superior Court*, 5 Wend., 114; S. C., 10 Wend., 285. *Guyott v. Butts*, 4 Wend., 579. *Gardiner v. Mitchell*, 6 Pick., 114. *Chatfield v. Lothrop*, Id., 417. *Parker v. Hardy*, 24 Pick., 246. * * * Evidence which brings to light some new and independent truth of a different character, although it tends to prove the same proposition or ground of claim before insisted on, is not cumulative within the true meaning of the rule on this subject." That case was an action for libel, and the question was, whether the words "rapacious creditor" were in the article as written by the defendant, or had been inserted by another without the defendant's knowledge. On the trial the defendant had testified that the objectionable words were not in the writing when signed by him. Afterwards he discovered evidence to the effect that the objectionable words had been inserted by the editor of the paper without the defendant's knowledge or consent. The facts were similar to the case at bar in this, that the newly discovered evidence would show by whom the offense was committed. We think, therefore, that the newly discovered evidence was sufficient to require the court to grant a new trial.

3. That the verdict does not respond to each charge in the indictment.

In *Wilson v. The State*, 20 Ohio, 26, it was held, under a statute from which ours was copied, that where *distinct* offenses are charged in separate counts of an indictment the jury must either return a general verdict or else respond

to each charge in their finding. . This decision was quoted with approval in *Williams v. State*, 6 Neb., 343. In *Wilson v. State* it is said: "We think it prudent in the case of distinct and independent offenses, especially where they are made so by statute, and are subjected to different degrees of punishment, to require the jury, in the absence of a general verdict, to affirm or negative each charge in their finding." This rule having been adopted by the supreme court of the state from whence our statute was copied, as said by LAKE, Ch. J., in *Williams v. State*, 6 Neb., 342 "We feel bound to follow the Ohio cases, not alone from the fact that in view of our legislation they are entitled to special consideration, but because they adhere more closely to the letter of the statute, and tend to greater certainty in fixing the grade of the offense." Where there are *distinct* offenses charged in the different counts of the indictment the jury must either return a general verdict of not guilty or respond specially to each charge in the indictment.

We see no error in the instructions, and none of the other errors assigned are preserved in a form to be available to the prisoner.

The judgment of the district court is reversed, and the cause remanded for further preceedings.

REVERSED AND REMANDED.

THE other judges concur.