JOHN W. ARGABRIGHT V. STATE OF NEBRASKA.

FILED OCTOBER 20, 1898. No. 9945.

1. **Murder:** EVIDENCE. Evidence examined, and *held* sufficient to sustain a verdict of murder in the first degree.

2. ——: ——: INSTRUCTIONS. The fourth and thirteenth instructions were based upon the evidence adduced on the trial.

3. **Witnesses:** IMPEACHMENT. The order of introducing testimony designated by section 478 of the Criminal Code will not preclude a defendant from introducing, in a proper case, testimony to impeach a witness examined by the state on rebuttal.

4. **Criminal Law:** ORDER OF INTRODUCING TESTIMONY: REVIEW. The order of introducing testimony in a criminal case rests largely in the discretion of the trial court, and an abuse of discretion in that regard is sufficient ground for reversal.

ERROR to the district court for Nemaha county. Tried below before LETTON, J. *Reversed.*

*W. H. Kelligar* and *H. A. Lambert*, for plaintiff in error.

*E. Ferneau*, County Attorney, *C. J. Smyth*, Attorney General, and *Ed P. Smith*, Deputy Attorney General, for the state.

NORVAL, J.

John W. Argabright was prosecuted by indictment in the district court of Nemaha county for the murder of William Smelser. A trial resulted in the conviction of the accused of the crime of manslaughter, and the sentence imposed upon him was reversed by this court at the September, 1896, term, for the giving of an erroneous instruction, and the cause was remanded to the court below for further proceedings. (49 Neb. 760.) The defendant was a second time placed upon trial, which terminated in a verdict of murder in the first degree, the jury fixing the punishment at imprisonment in the penitentiary for life, and this was the sentence imposed by the court. The record is again before us for review.

While the motion for a new trial and petition in error contain more than fifty assignments of error, the questions discussed in argument, and relied upon to secure a reversal, are confined to very narrow limits. The first point urged upon our attention is that the verdict is not sustained by sufficient evidence. The record shows without controversy that the accused was a son-in-law of the deceased, William Smelser, and for more than a year prior to the tragedy resided in South Omaha, and a portion of the time was on the police force of said city. His wife and two children lived with him until the fall of 1893, when, owing to domestic trouble between the accused and his wife, a separation took place. The wife returned to Nemaha county with the children, and made their home with her father. In November, 1893, the accused went to said county to visit his children, and on the road from the railroad station to Smelser's he met the latter, who informed him he could not see the children, and warned him to keep off the premises of the deceased. On this visit Argabright was permitted to see the baby alone, but not the older child. On February 7, 1894, the accused made a second trip by rail to Nemaha county, riding out from Howe with a Mr. Dressler. On the way

they met the deceased, who declined to speak to the defendant. The latter on February 8 went to the home of Mrs. Copeland, a sister of his wife, and sought to arrange for seeing his children, but was unsuccessful, and the forenoon of the next day he a second time visited Mrs. Copeland for the same purpose, and the defendant's father also went to the residence of the deceased to obtain permission for the accused to see his children, but Mr. Smelser refused to make such arrangements, and the children were not seen. That night an entertainment was given at the Champion schoolhouse, which was attended by the deceased and his wife, Mrs. Argabright, the wife of the accused, and their two children. There were also present on that occasion the defendant and a number of his relatives. The defendant remained in the schoolhouse for some time after the entertainment closed and so stationed himself that the Smelser family and Mrs. Argabright and the children could not leave the building without passing him. As the deceased and Mrs. Argabright were leaving the schoolhouse the accused intercepted them and attempted to see his boy, which deceased informed him he could not do. Thereupon the defendant drew his revolver and shot William Smelser, causing his instant death.

The killing is admitted, but it is asserted that there is no evidence to establish premeditation, deliberation, and malice. A careful perusal of the bill of exceptions convinces us that this contention is without foundation. It was established that defendant, a short time before the tragedy, purchased the revolver with which the fatal shot was fired, also bought a long-caped mackintosh, under which the revolver was concealed the night of the tragedy; that before leaving South Omaha he was advised by a friend not to take the fire-arm with him on his trip to Nemaha county, else he might get into trouble; that the defendant related his family difficulties to W. H. Beckett, and in that conversation with reference to his children and his father-in-law stated to Beckett "that

he would have his children or kill the old son-of-a-bitch;" that just before the defendant entered the train at South Omaha on February 7 he showed his revolver to James Emerick and stated to the latter as he stepped on the cars: "I shall surprise you wonderfully when I come back;" and that while the defendant was at the home of Mrs. Copeland the day preceding the tragedy he stated to her "that he had offered everything that was fair, and they would not let him see the children, and that he proposed to make it hot for them;" and in the same conversation stated that he would see the children before a week. These facts detailed by disinterested and credible witnesses, considered in connection with the actions and conduct of the accused at the schoolhouse the night of the homicide as detailed by the state's witnesses, are ample to show that the life of the deceased was taken with deliberation and premeditation, and that the verdict is not the result of either passion or prejudice on the part of the jury.

Complaint is made of the fourth and thirteenth instructions given at the request of the state. They are as follows:

"4. The court instructs the jury that the father of an infant child has no such vested right in the custody of his infant child as to authorize him to take it from its mother by force and against her will; and in this case, if you find from the evidence that at the time of the tragedy the mother of the defendant's infant child was living with her parents, the deceased, and his wife, and they together had the custody of this child, defendant would have no right to attempt to take such child from the arms of Mrs. Smelser, the wife of the deceased, by force and against her will."

"13. The court instructs the jury that if you find from the evidence that when the deceased made the first assault upon the defendant he honestly believed, from the conduct and actions of the defendant, that he was attempting by force to take the child from the arms of the

wife of the deceased; and if he had reasonable grounds to apprehend such contemplated design on the part of the defendant, he had the right to use such force as was reasonably necessary to defend the possession of said child and to protect himself and family as they passed to the door on the way home."

The vice imputed to these instructions is that they had no application to the evidence adduced on the trial. The bill of exceptions records ample testimony tending to establish that the accused, as the Smelser family were passing towards the door of the schoolhouse, reached for the child, and that it was his purpose forcibly to take it from the possession of the grandmother, and that when the deceased sought to prevent the accused from doing so, the latter drew his revolver, and while he did not succeed in obtaining the child, he did kill William Smelser. The instructions assailed are predicated upon the testimony, and the criticism brought against them is unfounded.

The defendant, while a witness in his own behalf, gave testimony tending to show that at the time the fatal shot was fired he was being assaulted by the deceased and James Sparks; that during the altercation he was struck by the latter and they were both following the defendant as he retreated towards the door of the schoolhouse. On rebuttal the state placed James Sparks upon the witness stand, who testified that he did not strike the defendant on the occasion in question, nor did he attempt to do so. After the state had finally rested, the defense applied to the court for permission to impeach the witness James Sparks by proving that he had stated the day following the tragedy, and at other times, to Amos Hughs, J. S. Thomson, William Hughs, and Levi Hughs, that he struck the accused, and had it not been a glancing blow it would have knocked him down. The court refused to allow such impeaching testimony to be given, although the proper foundation for its reception had been laid. Counsel for the state attempt to justify this

ruling upon the ground that section 478 of the Criminal Code fixes the order of proof. The third and fourth subdivisions of said section read as follows: "3d. The state must first produce its evidence; the defendant will then produce his evidence. 4th. The state will then be confined to rebutting evidence, unless the court for good reason, in furtherance of justice, shall permit it to offer evidence in chief." By the foregoing provisions the legislature has designated the usual order in which testimony is to be given upon the trial of a criminal cause. But the rule is not an imperative one which must be adhered to without deviation. The order of introducing testimony rests largely in the discretion of the trial court. (*Basye v. State*, 45 Neb. 261; *Clough v. State*, 7 Neb. 320.) In the last case cited, after the testimony for the state had closed and the defendant had examined a number of the witnesses, counsel for the state were permitted to open their case and introduce additional testimony in chief. Upon review this practice was sustained by this court. Manifestly the order of proof laid down in the statute could not be followed in all cases without working great injustice. The rule invoked by the prosecution in the case at bar would prevent a defendant in any criminal action from impeaching a witness called by the state on rebuttal, because the prisoner could not know before resting his case what witnesses would be examined in rebuttal, or what would be their testimony. To refuse to allow the defendant to introduce testimony to impeach the state's witness, Sparks, was clearly an abuse of discretion. The ruling of the court cannot be justified on the ground that the accused could not have been prejudiced by the exclusion of the testimony offered for the purpose of impeachment on the ground that the undisputed proofs showed that Sparks did not strike the defendant during the altercation. Many of the witnesses did so testify, but they were contradicted by the prisoner while he was being examined as a witness in his own behalf. The successful impeachment of Sparks

might have caused the jury to accept as true the testimony of the accused as to what transpired at the schoolhouse, and have caused them to return a verdict of manslaughter, if not one for acquittal. We are unable to determine, and no disinterested person who reads this record could say, with absolute certainty, that the verdict would have been the one returned had the excluded impeachment testimony been admitted. For the error indicated the judgment is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.