PAUL R. SMALL, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

85 N. W. 2d 712

Filed November 8, 1957. No. 34180.

382

*Schrempp & Lathrop,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Homer G. Hamilton,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The information in this case against the plaintiff in error Paul R. Small, hereinafter referred to as the defendant, charges him with robbery under section 28-

414, R. R. S. 1943. On this charge a trial to a jury was had resulting in a verdict of guilty. Thereafter the defendant's motion for a new trial was overruled and a sentence of confinement in the State Penitentiary for a period of 15 years was imposed. The defendant prosecutes error to this court.

Two grounds for reversal are presented: (1) The trial court erred in failing to sustain the defendant's motion to direct a verdict of acquittal or in the alternative to dismiss the information; and (2) the trial court erred in admitting rebuttal testimony which had no reasonable relationship to the defense. We consider the assigned errors in the order above enumerated.

The first assignment of error has to do with the sufficiency of the evidence to take the case to the jury.

There is no doubt in this case that Margaret W. Kellogg was the victim of an armed robbery at approximately 8 p.m., on October 18, 1955. The residence here involved was owned by Margaret W. Kellogg. It is located at 5601 Farnam Street in Omaha, and faces the east. There is a front door on the east and an entrance consisting of french doors on the north into a solarium from which entrance may be had to a living room and to a staircase leading to the upper floor. On the upper floor to the north is a bedroom occupied by Mae Hamernick who was a nurse companion of Mrs. Kellogg. There is also a hall, an upstairs living room, and a bedroom occupied by Mrs. Kellogg in the south part of the second floor. In the latter room was a safe in which she kept some money and other valuables. In the house on the night of the robbery were Mrs. Kellogg, Mrs. Hamernick, Mrs. Arthur a friend who at times visited Mrs. Kellogg, and also a friend Miss Gladys Rohrs who arrived at the Kellogg residence about 10 a.m., on the day of the robbery. She stayed there most of the day and was there for dinner about 6 p.m. After finishing dinner, about 6:30 p.m., Mrs. Kellogg and Miss Rohrs went upstairs. There was a television set

in Mrs. Kellogg's bedroom and they decided to watch a television program that came on at 8 o'clock. Miss Rohrs sat in a chair by the bed and Mrs. Kellogg lay down on the bed to watch the program. Just previous to this time Mrs. Hamernick and Mrs. Arthur, who had remained downstairs to tidy up the kitchen, came upstairs and went into Mrs. Hamernick's bedroom at the north end of the second floor. To get to Mrs. Kellogg's bedroom it was necessary to go through a sitting room. There was a wood panel door which blocked the entrance to the sitting room and a gate to confine some small dogs owned by Mrs. Kellogg. The main door was open and the gate across the door was in place.

Miss Rohrs testified that they heard a crash of glass. She got up to see what happened. She had slipped off her shoes. She picked them up and started through the living room to go into the hall. As she came through the hall door, a masked man grabbed her left arm and endeavored to pull her out into the hall. She told him to let go, that she had to open the little gate to get into the hall, which she did. This man had a silk stocking covering his face. He held a gun which he pointed at her and, in an excited tone of voice, told her to come out in the hall. They had an argument about her putting on her shoes, which she eventually did. After she got into the hall, this man told her to stand to one side. There was a light in the living room, but no light in the hall. About that time Mrs. Kellogg came to the door to see what the noise was about. The masked man saw her and yelled: "This is the one we want." Mrs. Kellogg slammed the sitting room door. Miss Rohrs further testified that there were two masked men in the house. The other one was in the room where Mrs. Hamernick and Mrs. Arthur were. He came running down the hall. After Mrs. Kellogg slammed the door, the masked man who held the gun on Miss Rohrs turned the lights on and off in the hall. The two masked men proceeded to break down the door to gain entrance to

Mrs. Kellogg's bedroom. At that time Miss Rohrs ran down the back stairs and gained entrance to the Roncka home which is just south of the Kellogg residence. From the front porch of the Roncka home she could see one of the masked men and Mrs. Kellogg at the safe. The masked man was standing over Mrs. Kellogg. She later saw the same men running east across the street. She further testified that the man who pointed the gun at her kept changing the gun from one hand to the other as he was talking to her in the hall; and that he was slight of build, had on a light beige sport jacket and, she supposed, gabardine trousers. He also had on a hat. She heard his voice in a conversation lasting a minute or two. She could not observe his features through the silk stocking mask because it came below his chin, to about the middle of his neck. He was nervous and in a crouching position at times. Both of the masked men were about the same build, except the man who came down the hall might have been a little heavier. This man had no conversation with her.

Mrs. Mae Hamernick testified that she lived with Mrs. Kellogg as a nurse companion, and was at the residence the night of the robbery. She and Mrs. Arthur were in her bedroom looking at television when they heard a "rumbling" noise which was almost below her window. They got up to investigate, and at that time a man came running down the hall. He had a gun and said it was a hold up, and "I mean it." He came into her room. He was going to lock them in the bathroom, but there was a lock on each side and he decided that would not do. He looked around, and directed Mrs. Hamernick to sit at the head of the bed, which she did. This man then went down the hall toward Mrs. Kellogg's room. She further testified that the man she saw was not big. He had on a light sport coat with black blotches in it and heavily padded shoulders. He was wearing a hat. She could give no description of the other man. The man she saw had a stocking over his face.

Proper foundation was laid for the introduction of Mrs. Kellogg's evidence taken at the preliminary hearing, as she was too ill to testify at the trial. Her evidence was read to the jury. She testified that about 8 p.m., on October 18, 1955, she was held up by two robbers who each had a gun. She and Gladys Rohrs were in her bedroom watching television. Mrs. Hamernick and Mrs. Arthur were in Mrs. Hamernick's bedroom also watching television. Mrs. Kellogg was lying on the bed watching the program and Miss Rohrs was sitting in a chair. They heard a noise and jumped up. By the time they got from the bedroom to the sitting room door the robbers were at the door. One of them went into Mrs. Hamernick's room to take care of her and Mrs. Arthur, and said he was going to kill them. The other robber had a gun pointed at her and Miss Rohrs. They wanted her to open the safe. She had just been in the safe and it was closed but not locked. The robbers took a bedspread off the bed and dumped her papers, money, and jewelry on the bedspread. There was about $4,500 in money in the safe. They tied the bedspread, and one of them threw it over his shoulder and they hurried out of the house. During the process of the robbery she put her hand on one of the robber's hands and said: "Let's sit down and talk this over"; and he said "Take your hand off of me or I'll kill you." She let him take the money and personal property then.

On cross-examination she testified that when she heard the noise she and Miss Rohrs were together and went to investigate. When she got to the sitting room door she could see into the hall and see these masked men. Miss Rohrs was pulled into the hall by one of the men. At that time Mrs. Kellogg slammed the door and locked it. They broke down the door to gain entrance, and one of the robbers covered her with a gun and went through the safe. She further testified on cross-examination that the man who came through the door had a stocking over his head and had on a felt

hat. The hand that held the gun was a light, thin hand. She did not remember the first conversation with the man who entered her room, but she knew he said, "This is the one we want" meaning her, and told her to take him to the safe and open it. She further testified that it was rather hard to tell the denominations of the money in the safe, it could have been in one hundred dollar bills, fifty dollar bills, and some twenty dollar bills. With reference to five hundred dollar bills, she indicated that there could have been some in the safe.

A detective of the police department was summoned to the Kellogg home, arriving there almost immediately after the robbery. He found the frame of the doors in the north entrance broken. He went into Mrs. Kellogg's bedroom and observed the safe. It was open, and some of the small compartments had been removed. He talked to the ladies in the house, made some notes of the conversation, and prepared a report. He learned from the ladies that two masked men had robbed the house. He took two hats that were left behind by the robbers.

A lieutenant of police assigned to burglary and robbery investigation went to the Kellogg home the night of the robbery. He took Mrs. Kellogg and Miss Rohrs to the second floor of the police station where the identification bureau is located. This was at approximately 10 or 10:30 p.m. They were shown several hundred regular standard police pictures commonly referred to as "mug shots" which, for the most part, were mounted on hinges in metal trays. They looked at the pictures until 11 p.m.

Miss Rohrs testified that on the night of the robbery she went to the police station about 9:30 p.m. They took her into a large room and brought out a number of pictures, some of which were loose, some in drawers, and some in trays. She and Mrs. Kellogg looked through a number of the trays and, from looking at the pictures, she selected three as resembling one of the men involved in the robbery. The officer then

brought out full length pictures of the three she had selected. She looked over these pictures carefully and pointed out the man she thought was one of the robbers. After leaving the police station she went back to the Kellogg home. The next morning she returned to the police station with Mrs. Kellogg and Mrs. Hamernick. They went into a small closet located in the inspector's office where they could look through a window and see people, but the people could not see them. The defendant was brought in. She viewed him and at that time identified him as one of the robbers. On the same day, or another day, she was unable to remember which, the three ladies were taken to another floor of the police station where they stood in a sort of a hall near a barred door. They could see the room. Prisoners were marched before them. They observed four or five men for a minute or two. In this line-up was the defendant. He said something, and she believed his voice to be the voice of the man she met in the hall at the Kellogg residence the night of the robbery. She also observed the left hand of this man and described it as a light colored, slender hand. To her mind, she made a positive identification of the defendant. To do this, she considered the build of the man, his voice, and his hands. She further testified that the build of the man she saw at the police station was the same as that of the man she saw in the hall at the Kellogg home the night of the robbery, the voice was the same, and the hand resembled the hand that held the gun. In addition, she pointed the defendant out in the courtroom.

Mrs. Kellogg testified that in the line-up at the police station she thought she saw one of the men who took part in the robbery. She testified that she made an identification, as far as one could be made. At the line-up the defendant was asked to put out his hands. Mrs. Kellogg testified that she thought she identified him at that time and that the basis of her identification was mostly his posture and his hands.

A lieutenant of police testified that he talked to Mrs. Kellogg and Miss Rohrs at the police station on October 19, 1955. He was assigned to take them to the jail on the fourth floor to conduct a show-up of a prisoner in custody. He further testified that the witnesses were left in the jail lobby. The suspect and other prisoners were lined up inside the doorway in the jail office. There were four men in this particular line-up, the defendant and three others. He had them step forward one at a time and stand in front of the doorway, at which time he asked each one his name, age, address, occupation, and what he was in jail for. He had them each speak and hold out their hands for examination, and then requested them to step back. Each man then made a quarter turn to the right and a half turn to the left for a profile examination. He asked Mrs. Kellogg, Miss Rohrs, and Mrs. Hamernick if they could identify any of the men.

A captain of police, whose duty covered investigations, testified that he had occasion on October 19, 1955, to go to Meek's Garage at Sixteenth and Leavenworth Streets. He and his partner arrived there at approximately 2 p.m. They checked the garage and found a 1952 Cadillac car belonging to the defendant. Shortly thereafter the defendant entered the garage and was placed under arrest. He was searched and cash taken from his person in the amount of $354.05, mostly in ten and twenty dollar bills. The defendant was taken to the office of inspector Brown at the police station, arriving there at 2:15 or 2:20 p.m. He was interrogated and asked to remove his clothing. In taking off his shorts, a quantity of money fell from where he had secreted it. This money consisted of two five hundred dollar bills and five one hundred dollar bills. After further investigation, the defendant was booked.

A title clerk in the office of the county clerk testified to a certificate of title issued October 18, 1955, in the name of the defendant on a 1950 Pontiac which was

acquired on October 17, 1955, from Wolfson Used Cars.

Inspector Brown of the police department testified that he reported for work at 6:30 a.m., on October 19, 1955, and the defendant was then in custody. The defendant had been booked that morning at 1:15 a.m., and released about 8:30 a.m. He further testified that he had occasion to investigate the Kellogg robbery, and in connection with this matter he and another officer went to the Wolfson Auto Sales lot at Twenty-fourth and Ames Streets, arriving there at approximately 10:30 a.m. After arriving at the Wolfson lot, a 1950 Pontiac bearing a Nebraska license and dealer plates was searched resulting in a silk stocking being found in the car. After the second arrest, as previously mentioned, the defendant was again in the inspector's office. He testified to the defendant removing his clothing and the finding of a quantity of money which the defendant had secreted. Mrs. Kellogg, Miss Rohrs, and Mrs. Hamernick came to the office and were put into the special place where they could use the facilities as a matter of identification of the defendant. The inspector further testified that he drove the 1950 Pontiac from the Wolfson lot to the police station and had difficulty with the transmission. He questioned the defendant about the car and the defendant told him that he returned the car due to the fact that he had some motor trouble; that there was some defect in it; and that he drove it to Wolfson's sales lot the evening of October 18, 1955.

The defense was an alibi. An employee of the police department testified that the defendant was booked at 1 a.m., October 19, 1955, on a charge of vagrancy and at that time he had $52.20 on his person; and that his case was dismissed October 22, 1955.

A waitress at the Reno Bar testified that she knew the defendant as one of the customers of the bar; that on October 18, 1955, the defendant came into the bar about 7:30 p.m.; that there was a three-piece orchestra which started playing in the bar at 8:45 p.m., and played

until nearly closing time; that she observed the defendant visiting with people at the bar; that he talked to her and she danced with him a couple of times; that the defendant left about 10 p.m., and returned about half an hour later; and that the defendant was arrested in the bar about midnight.

The leader of the orchestra that played in the Reno Bar testified that he arrived at the Reno Bar between 20 minutes after 8 and 20 minutes to 9 p.m. When he arrived on October 18, 1955, the defendant was there and talked to him. The defendant left a little before 10 p.m., came back, and was arrested in the bar.

One of the musicians also testified to seeing the defendant in the bar that night. He knew the defendant by sight, and saw him leaning over the bar talking to someone about 9 p.m.

In considering the defendant's first assignment of error wherein the defendant contends that there was no possible means of identifying the defendant as one of the robbers of the Kellogg home and that the evidence in this respect was wholly insufficient to take the case to the jury, we believe the following to be applicable.

In 20 Am. Jur., Evidence, § 880, p. 740, it is said: "The general rule is that a person of ordinary intelligence who first qualifies himself to speak upon the subject by showing that he has had opportunity for personal observation may give opinion testimony as to a person's identity from any fact that leads him to believe that he knows the identity of the person in question. Such person may base his conclusion upon the form, size, manner, walk, tone of voice, or any mark or peculiarity of the person, rather than upon a view of his features. * * * Another recognized method of proving identity is the testimony of a witness to his recognition of a person's voice; such proof is not regarded as a matter of opinion, but the statement of a conclusion directly and primarily operating from the sense of hearing—in other words, direct and positive proof."

In Wilshusen v. State, 149 Neb. 594, 31 N. W. 2d 544, this court said: "Where an accused is identified by a witness who has had a reasonable opportunity to observe him such evidence is admissible and the probative value of such evidence is a question for the jury."

In Froding v. State, 125 Neb. 322, 250 N. W. 91, it is held: "Where an accused is identified by a witness solely from having heard his voice, the probative value of such evidence is a question for the jury.

"The positive testimony of one credible witness, identifying the defendants as perpetrators of the crime of robbery from the person, may be sufficient to support a conviction."

The court went on to say: " 'That one may be identified by his voice is now generally held by the authorities. * * * Accordingly it has been held to be competent evidence to support a conviction, where a prosecuting witness identified the defendant solely by his voice, and where the witness had never heard the defendant's voice but once before the commission of the crime, and that on the same day that the crime was committed, and then heard him speak only a few words.' 8 R. C. L. 184, sec. 176. See Mack v. State, 54 Fla. 55, 13 L. R. A. n. s. 373, and note.

"We have held that the positive testimony of one credible witness identifying the defendant as perpetrator of the crime is sufficient to support a conviction. Lee v. State, 124 Neb. 165, and cases cited in the opinion." See, also, 20 Am. Jur., Evidence, § 351, p. 326; Commonwealth v. Hayes, 138 Mass. 185; Ogden v. People, 134 Ill. 599, 25 N. E. 755; State v. Herbert, 63 Kan. 516, 66 P. 235.

In Opanowich v. Commonwealth, 196 Va. 342, 83 S. E. 2d 432, it is said: "In an annotation to the case of Mack v. State, 54 Fla. 55, 44 So. 706, in 13 L. R. A. (N. S.) at page 373, it is said: 'The cases with great unanimity sustain the ruling in Mack v. State, that a witness may be permitted to identify a person solely

from having heard his voice, and such testimony will be admissible and legitimate to establish identity.'"

We conclude that on this phase of the case the evidence was sufficient to take the case to the jury.

The defendant's first assignment of error is also predicated on the claim that the circumstantial evidence introduced does not implicate the defendant in the robbery.

This court in Morgan v. State, 51 Neb. 672, 71 N. W. 788, held: "The test by which to determine the sufficiency of circumstantial evidence in a criminal prosecution, is whether the facts and circumstances tending to connect the accused with the crime charged are of such conclusive nature as to exclude to a moral certainty every rational hypothesis except that of his guilt.

"It is the province of the jury to determine the circumstances surrounding, and which shed light upon, the alleged crime; and if, assuming as proved the facts which the evidence tends to establish, they can be accounted for upon no rational theory which does not include the guilt of the accused, the proof cannot, as a matter of law, be said to have failed. (Casey v. State, 20 Neb., 138.)" See, also, Kitts v. State, 153 Neb. 784, 46 N. W. 2d 158; Maher v. State, 144 Neb. 463, 13 N. W. 2d 641.

It should be borne in mind, however, that the unsupported testimony of the accused in a criminal case, which the jury does not believe, cannot be said to furnish a hypothesis consistent with the innocence of the accused.

The ultimately applicable rule in the case at bar is that: "This court, in a criminal action, will not interfere with a verdict of guilty, based upon conflicting evidence, unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt." Williams v. State, 115 Neb. 277, 212 N. W. 606. See, also, Kitts v. State, *supra.*

With the foregoing authorities in mind, we proceed

to the rebuttal evidence offered by the State which constitutes the basis of the defendant's second assignment of error.

Harry Wolfson testified that he was a used car dealer and transacted business with the defendant by selling him a 1950 Pontiac automobile in October 1955. As shown by an exhibit, the date of the sale is indicated as October 14, 1955. He saw the Pontiac car again sitting in his used car lot on October 19, 1955. He further testified that he worked from 10 a.m. to 8:30 p.m., on October 18, 1955. This Pontiac car was not in his used car lot at that time. On redirect examination he testified that a complaint was lodged with his company on October 19, 1955, relative to some mechanical difficulty with the car.

The treasurer and manager of a finance company testified that about 12 o'clock, noon, October 19, 1955, the defendant came into the finance office and paid $1,550, using three five hundred dollar bills, two twenty dollar bills, and one ten dollar bill, to pay off the loan against a car which had been repossessed by the company for security reasons.

An officer assigned to the detective bureau and also to the Kellogg case testified that he had occasion to make an arrest, and arrested the defendant at the Reno Bar at 12:30 a.m., October 19, 1955. At that time he had a conversation with the defendant. Other officers were present. This conversation took place in the detective bureau at 12:45 a.m., the same day. The defendant said he left his apartment about 7:30 p.m., went to the Reno Bar and stayed there until 8:30 p.m., when he went to the 1512 Club at 1512 Harney Street, a block and a half distant from the Reno Bar; that he walked to the 1512 Club; and that he had one drink there and returned to the Reno Bar.

A witness who was attending a barber school and who also drove a yellow cab in the evenings testified that he commenced driving on October 18, 1955, at 5:30

p.m. He tried to finish his work at 10 p.m. He was called to the Wolfson auto lot at Twenty-fourth and Ames Streets and arrived there about 20 minutes to 10 p.m., to pick up a fare. His fare was the defendant. He took him to the Reno Bar, arriving there about 10 minutes to 10 p.m., and the defendant asked him to wait. The defendant got out of the cab and went into the bar. The cab driver could observe him as he walked to the bar and away from there and around the room talking to different people. The defendant stayed in the bar about 5 minutes and returned to the cab and was taken to the 1512 Club, and that was the end of the fare. The trip slip, an exhibit in evidence, discloses the foregoing facts.

Section 29-2016, R. R. S. 1943, provides in part: "After the jury has been impaneled and sworn, the trial shall proceed in the following order: * * * (4) the state will then be confined to rebutting evidence, unless the court for good reason in furtherance of justice, shall permit it to offer evidence in chief; * * *."

In Hampton v. State, 148 Neb. 574, 28 N. W. 2d 322, this court said: "It is within the sound discretion of the court to permit in rebuttal the introduction of evidence not strictly rebutting."

The order in which a party shall introduce his proof is to a great extent discretionary with the trial court, and the court's action will not be reversed unless an abuse of discretion is shown. See, Joyce v. State, 88 Neb. 599, 130 N. W. 291; Baer v. State, 59 Neb. 655, 81 N. W. 856.

As said in Lovings v. State, 158 Neb. 134, 62 N. W. 2d 672: "In a criminal prosecution any testimony otherwise competent which tends to dispute the testimony offered on behalf of the accused as to a material fact is proper rebuttal testimony, and it is within the discretion of the court to permit in rebuttal the introduction of evidence not strictly rebutting." See, also,

Drewes v. State, 156 Neb. 319, 56 N. W. 2d 113; Argabright v. State, 56 Neb. 363, 76 N. W. 876.

The testimony offered by the State in rebuttal is in a true sense rebutting testimony, rebutting the alibi of the defendant and in addition rebutting the fact that the defendant had little money when in fact upon his second arrest it developed that he had over $3,000. We find no prejudicial error in the admission of this evidence.

The evidence shows that there was a positive identification of the defendant. A silk stocking was found in the back seat of the car owned by the defendant the day after the robbery. Both men who committed the robbery had silk stockings over their faces. The defendant's Pontiac car was found in a used car lot. He took a yellow cab from this lot 1 hour and 40 minutes after the robbery. He paid off an obligation on his Cadillac car the day after the robbery was committed, in the amount of $1,550, and when apprehended the second time he had $1,500 secreted on his person and over $300 in his billfold. The loss Mrs. Kellogg suffered in money was $4,500. The denominations of the bills found on the defendant's person and used to pay the mortgage on the Cadillac car correspond somewhat closely to the bills taken from Mrs. Kellogg's safe.

Referring to the authorities on circumstantial evidence heretofore set forth, we conclude that the circumstances, coupled with the identification of the defendant, were sufficient to take the case to the jury.

The credibility of witnesses and the weight of the evidence are for the jury to determine in a criminal case and the verdict of the jury will not be disturbed by this court unless it is clearly wrong. Griffith v. State, 157 Neb. 448, 59 N. W. 2d 701; Franz v. State, 156 Neb. 587, 57 N. W. 2d 139; Fisher v. State, 154 Neb. 166, 47 N. W. 2d 349. The evidence in the instant case does not permit a conclusion that the verdict of the jury is without proof to sustain it.

Finding no error in the record prejudicial to the defendant, we conclude that the judgment of the trial court should be, and hereby is, affirmed.

AFFIRMED.