*Lee, P. J.* and *Gillespie, McElroy* and *Jones, JJ.,* concur.

■■■

LEE *v.* STATE

No. 41954 November 6, 1961 134 So. 2d 145

98

*Robert T. Riser, Dennis Baker, D. R. Johnson,* Batesville, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

KYLE, J.

The appellant, Ellic Lee, also referred to in the record as "Ellis Lee", was indicted by the grand jury in the Circuit Court of the Second Judicial District of Panola County, at the October 1960 Term of the Court, for the crime of rape, alleged to have been committed on June 6,

1960. Upon motion of the appellant a change of venue was granted, and the case was tried in the Circuit Court of Coahoma County during the January 1961 Term of the Court. The appellant was convicted and sentenced by the court to suffer death by lethal gas on February 28, 1961, in the State Penitentiary at Parchman. The appellant's attorneys filed a motion for a new trial, which was overruled. From the judgment of conviction and sentence and the order overruling his motion for a new trial, the appellant has prosecuted this appeal. The record shows that two other persons were involved in the forcible entry of the home of the prosecutrix and the rape of the prosecutrix by the appellant.

The appellant's attorneys have assigned and argued three points as grounds for reversal of the judgment of the lower court:

(1) That the court erred in overruling the appellant's motion for a directed verdict at the conclusion of the State's evidence for the reason that the State failed to prove beyond a reasonable doubt and to a moral certainty the guilt of the appellant;

(2) That the court erred in permitting testimony to be given by the prosecutrix, who testified as a witness for the State, relating to her having been raped by one Howard Cook, one of the three persons who had invaded her home, prior to any testimony as to the alleged rape of the prosecutrix by the appellant; and

(3) That the court erred in permitting testimony to be given by Daniel Pope, a witness for the State, concerning the identification of certain articles of personal property found in the home of the prosecutrix approximately two hours after the alleged crime had been committed.

The record shows that the prosecutrix was a young white married woman who, at the time the alleged crime was committed, was living with her husband and three small children in a ranch type dwelling house situated

on the north side of State Highway No. 6 about 12 miles west of the Town of Batesville. The dwelling house was a substantially built house consisting of three bedrooms, a kitchen, utility room, small hall, and a bathroom. There were two large chicken houses and a Negro church on the east side of house and a lake north of the Negro church. The prosecutrix testified that her husband was engaged in the business of operating a gasoline service station and garage on State Highway No. 6, about one-half mile east of the Town of Batesville; that he left home each morning about 6:30, and usually returned to the home after dark; and that their nearest neighbor lived about a quarter of a mile from them.

The prosecutrix testified that she was at home with her children at the time the alleged crime was committed, about 3:00 o'clock in the afternoon of June 6, 1960. She had driven her automobile to a nearby country store just before the noon hour, and when she returned to her home she had left the car, which was a 1956 Ford, parked in the driveway facing north just a little way from the house. She stated that after she and the children had eaten their midday meal she watched two 30-minute television programs and then went into the garden for the purpose of hoeing two rows of corn and a row of beans. She was dressed in her underwear, a blouse and Bermuda shorts. While she was in the garden hoeing the corn, she heard the voice of a man telling her to turn around and squat down. She looked up and saw a Negro man squatted down between two rows with a gun pointed at her and an open knife in his mouth. The Negro told her that he did not want anything except some clothes and food, and he asked her whether that was her car in the driveway. She told him that it was her car. The prosecutrix stated that she did not know the person who was talking to her, but she later learned that his name was Foreman. She stated that Foreman called to another Negro, who was standing at the end of the garden with a

rifle in his hand, and told him to go in the house and see if there was anybody there. She learned later that his name was Cook. She stated that she told Foreman there was no one in the house except her children, and Foreman said, ''Well, we will just find out.'' Cook then went into the house and came back to the edge of the garden and said everything was all right. The two oldest children came out of the house with him. Foreman then picked up a clod of dirt and threw it over toward the barn, and a third Negro appeared on the scene. The prosecutrix stated that she later learned that his name was Lee, and she then identified the defendant at the bar as the person referred to as Lee.

The prosecutrix stated that she and the children and the three Negroes then went into the house, and Cook stood guard over her and the children in the kitchen, while Foreman and Lee went through the other rooms of the house searching for clothes and guns. Cook had a gun in his hand and told the prosecutrix to sit down in a chair. She and the children remained in the kitchen with Cook guarding them about five minutes. The prosecutrix stated that Foreman then came into the kitchen and made her go into the bedroom. The children were put in a closet just at the foot of the bed. Foreman told her that he would have to tie her up, and he took a pair of her husband's pants and tore them into strips and tied her feet to the foot of the bed and her hands behind her. Foreman then went into another room and got a pillow case and put it over her head and tied it under her chin. He told her that he hated to do that, but he had to tie the pillow case over her head, so that she could not see which way they were going to leave. The prosecutrix stated that she had ample opportunity to hear the voices of the three men, and that she was able to identify their voices.

The prosecutrix stated that, after Foreman had tied her up Cook came to the bed and turned her over and

tried to have sexual intercourse with her. But Foreman came back in and caught Cook and made him get up; and Foreman told Cook that ''he would get the gas chamber for anything like that, that that wasn't what they were there for.'' Lee was in the room at that time and had a rifle. Foreman then said that he was going out to get the car. He had already asked the prosecutrix while they were in the garden whether the keys were in the car. The Negroes had been in her house about 30 minutes at that time.

The presecutrix was asked how she knew Foreman left the room after he put the pillow case over her head. Her answer was, that he was the first one that came out, and she knew Foreman's voice; that she had heard him talk; and he was standing right beside the bed when he said that he was going out to get the car. She stated that she heard the door slam when Foreman went out, and after she heard the door slam she heard the voices of Cook and Lee in the room. Cook told Lee to watch out the window, and Cook then raped her. The appellant's attorney at this time objected to further evidence concerning this alleged attack, on the ground that Lee was the defendant on trial, and that they were not trying Cook. The objection was overruled. The prosecutrix stated that Cook then asked Lee if he was ready. Lee said he was, and Lee then raped her. Cook raped her again. She then heard the car go around the house, and Foreman came back into the bedroom. The three Negroes went into the kitchen to get the food and left soon thereafter.

The prosecutrix stated that she resisted as much as she could when she was assaulted by Cook and Lee. She realized that her life and the lives of her children were constantly threatened by the armed assailants, and she remained where she was ten or fifteen minutes after the three men left the house. She then freed herself, put on some clothes, and let the children out of the closet; and

she and the children ran to the highway to get help. One car passed, and then a pickup truck came along and she stopped it and told the driver what had happened. The driver of the pickup truck was a Mr. Grimes; and he and a highway patrolman went back to her house with her to get her automobile tag receipt. The patrolman then called her husband, who came out in a few minutes and took her to the hospital at Batesville, where she was examined and treated by Dr. Ben Moore. She remained in the hospital five or six days.

The prosecutrix was asked what color and type of pants each of the Negroes had on. She stated that Foreman had on a pair of blue dress pants; that Cook had on khaki pants, but changed into a pair of green and yellow pants which belonged to her husband; and that Lee had on light brown or tan corduroy pants, which were faded. She stated that all three of the men while in the house put on blue shirts which belonged to her husband. The prosecutrix identified, and the State offered in evidence as exhibits to the prosecutrix' testimony, the pillow case which Foreman had put over her head, and the pair of her husband's pants and the strips of pants which had been torn up and used to tie her feet to the bed. On cross-examination the prosecutrix was asked to describe the three men who entered her home as to height and weight. She stated that Cook was the tallest of the three men; that Lee was some shorter than Cook, but was much heavier; that Foreman and Lee were about the same size; that Lee's voice was different from the voices of Foreman and Cook. She was then asked how she could identify the two men who raped her when she had the pillow case tied over her head. Her answer was that she could identify them by their voices; that Cook talked to her "all the time", and she knew his voice; that she had heard Foreman talk "quite a bit"; and that Lee's voice was different from theirs.

Arthur Grimes, who lived at Clarksdale, and was a sheet metal worker at the Tennessee Gas Pumping Station between Marks and Batesville, testified that he came off the job about 3:30 P.M., and while enroute home he saw the prosecutrix and her three children standing by the side of the highway. He stated that ''she was crying and flagging us down'', and she reported to him that she had been assaulted. He stated that a highway patrolman came by, and that he and the patrolman drove into the driveway of the prosecutrix' home, and the prosecutrix gave the patrolman her car tag receipt. Grimes stated that he then took the prosecutrix over to her father-in-law's home about 3½ or 4 miles down the highway toward Batesville. Dr. Ben Moore testified that he examined the prosecutrix at the Batesville Hospital about 4:30 P.M., and she told him that she had been raped. He stated that the prosecutrix was quite emotionally upset and crying most of the time. However, she was in complete control of herself. She remained in the hospital six, seven or eight days. On cross-examination Dr. Moore stated that he did not find any bruises on her body. Daniel Pope, the vocational agricultural teacher at Crowder, testified that he went to the home of the prosecutrix' mother during the late afternoon of June 6, and that he saw the pillow case and the torn pants and strips of pants which had been offered in evidence laying on the bed in the back bedroom.

Ross Darby, Sheriff of Panola County, testified that he found the appellant in a field or briar patch about six miles east of Batesville late in the afternoon of June 6, and that he found the prosecutrix' automobile parked in the road about three quarters of a mile farther east from the place where the appellant was found. The car had been wrecked. The sheriff stated that he did not know at the time he saw the appellant that the crime charged against him had been committed.

The appellant did not testify in his own behalf and offered no other witnesses to testify for him.

We think there was no error in the action of the trial judge in overruling the appellant's motion for a directed verdict at the conclusion of the State's evidence, or in the refusal of the trial judge to grant the peremptory instruction requested by the appellant after both sides had rested.

The appellant was indicted under Section 2358, Miss. Code of 1942, Rec., for forcibly ravishing the prosecutrix; and this Court has held in numerous cases that in a prosecution for rape under that statute the victim's evidence is sufficient to sustain a conviction without corroboration, if it is consistent with the surrounding circumstances and conditions shown by the evidence. McArthur v. State, 105 Miss. 398, 62 So. 417; McLaurin v. State, 129 Miss. 362, 92 So. 289; Sanders v. State, 150 Miss. 296, 116 So. 433; Fairley v. State, 152 Miss. 656, 120 So. 747; Boyd v. State, 189 Miss. 609, 198 So. 561; Rogers v. State, 204 Miss. 891, 36 So. 2d 155; Johnson v. State, 213 Miss. 808, 58 So. 2d 6; Buchanan v. State, 225 Miss. 399, 83 So. 2d 627. ██ █ The prosecutrix' testimony in this case was neither contradicted nor discredited by other evidence, or by any facts or surrounding circumstances; and her testimony, in our opinion, was sufficient to support a finding that the appellant was guilty of the crime charged against him.

It is argued, however, that the prosecutrix had never seen the three persons who invaded her home prior to the date of the alleged crime, and since she had a pillow case tied over her head at the time the alleged crime was actually committed, the prosecutrix' identification of the appellant as one of the persons who actually ravished her was based entirely upon her recognition of his voice, and that such voice recognition testimony was insufficient to prove the identity of her attacker beyond a reasonable doubt and to a moral certainty.

■■■ But the courts have generally held that testimony identifying the accused by recognition of his voice is direct evidence, and the weight to be given such testimony is a question of fact for the jury to determine. See Annotation—Identification of Accused by his Voice, 70 A.L.R. 2d 995, 1012, and cases cited.

In discussing the competency and weight to be given to such voice recognition testimony, the text-writer in 20 Am. Jur. p. 326, Evidence, Sec. 351, says: "Such evidence is not the statement of mere matter of opinion, but is the statement of a conclusion reached directly and primarily from an operation of the sense of hearing. It is direct and positive proof. The infrequency with which the witness heard the voice before the time in question is not a reason for the exclusion of his testimony, although it may affect the probative value thereof * * *. It is for the jury to determine whether such evidence, considered in connection with other evidence of identity, sufficiently establishes the identification of the accused."

In Pickett v. State, 164 Miss. 142, 143 So. 692, the Court held that in a robbery prosecution evidence of the identification of the defendant obtained through the sense of hearing was competent and that, whether the defendant was sufficiently identified as the person who committed the robbery was a question for the jury.

The case most often cited by other courts on the point we have under discussion here, however, is the case of Mack v. State (1907), 54 Fla. 55, 44 So. 706, 13 L.R.A. (NS) 373, 14 Ann. Cas. 78; and in that case the Court affirmed a rape conviction, in which the victim never saw her attacker but recognized him by his voice, although she had never heard him speak prior to the assault. In State v. Kilpatrick (1946), 110 Utah 355, 173 P. 2d 284, the Court affirmed a judgment entered upon a conviction of second degree burglary, in which the only "direct evidence" placing the defendant at the scene of the

burglary was voice recognition testimony of the night-watchman employed there. In the very recent case of Small v. State (1957), 165 Neb. 381, 85 N. W. 2d 712, 70 A.L.R. 2d 984, the Court held that the evidence in a prosecution for robbery was sufficient to take the case to the jury, in view of the circumstantial evidence tending to connect the defendant with the crime, even though the only identification of the defendant as one of the robbers, who had worn silk stockings over their heads at the time of the robbery, was based on the build of the man, his posture, his voice and his hands.

In the case that we have here the evidence shows that the prosecutrix had ample opportunity to observe the build, the movement, and the voice of the appellant and of each of his two confederates for a period of approximately 30 minutes before the pillow case was placed over her head. She had heard the voice of Foreman repeatedly since he first spoke to her in the garden, and after the pillow case was placed over her head and Foreman had left the room, she knew that the only two men remaining in the room with her were Cook and the appellant whose voice she was able to identify as being different from that of Cook. We think it is clear that the prosecutrix' testimony, if believed, when considered along with the other facts and circumstances in evidence, was sufficient to establish the appellant's identify as the perpetrator of the crime charged against him beyond a reasonable doubt and to a moral certainty, and that there was no error in the court's refusal to grant the appellant's request for a directed verdict.

 Neither do we think that the court erred in permitting testimony to be given by the prosecutrix relating to the alleged rape of the prosecutrix by Howard Cook prior to the testimony concerning the alleged rape of the prosecutrix by the appellant.

 Evidence which is material, relevant, and otherwise competent to prove the guilt of the accused in a case

of this kind cannot be excluded because it may result in the disclosure of facts relating to the commission of other crimes. And this is especially true when the fact of the commission of such other crime, as in the case that we have here, forms a part of a chain of facts so intimately connected that the whole must be heard in order to interpret its several parts. Raines v. State, 81 Miss. 489, 33 So. 19; Collier v. State, 106 Miss. 613, 64 So. 373; Hurd v. State, 137 Miss. 178, 102 So. 293; Stone v. State, 210 Miss. 218, 49 So. 2d 263; Tanner v. State, 216 Miss. 150, 61 So. 2d 781; Bellew v. State, 238 Miss. 734, 106 So. 2d 146.

It is generally held that, ''If several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them, cannot be given without showing the others, evidence of any or all of them is admissible against a defendant on trial for any offense which is itself a detail of the whole criminal scheme.'' Underhill's Criminal Evidence, Fifth Ed. Vol. 1, p. 471, Sec. 207. See also Bangren v. State, 198 Miss. 359, 22 So. 2d 360; Massey v. State (Miss. 1944), 19 So. 2d 476; State v. Sykes (1905), 191 Mo. 62, 89 S. W. 851; Claxton v. State (1928), 109 Tex. Cr. 345, 4 S.W. 2d 542; Hazzard v. State (1930), 115 Tex. Cr. App. 622, 27 S. W. 2d 191.

 Finally, it is argued that the court erred in permitting testimony to be given by Daniel Pope concerning the pillow case and strips of clothing found at the residence of the prosecutrix, which had been offered in evidence as exhibits to the testimony of the prosecutrix, and the condition of the articles at the time he visited the prosecutrix' home about two hours after the alleged rape. But we think there was no error in the court's permitting Pope to testify that he saw the pillow case and the strips of torn pants lying on the bed in the back bedroom of the prosecutrix home when he went to her home

with his wife and the prosecutrix's mother about two hours after the crime had been committed. Pope's testimony concerning the condition of the pillow case and the strips of torn pants was merely corroborative of the prosecutrix' own testimony relating to the articles which had already been introduced in evidence.

We find no reversible error in the record and the judgment of the lower court is therefore affirmed, and Wednesday, December 20, 1961, is fixed for the date of execution of the death sentence in the manner provided by law.

Affirmed.

All justices concur.