# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-01607-COA

GEORGE LEE PARKS A/K/A GEORGE LEE          APPELLANT
PARKS, III A/K/A GEORGE L. PARKS, III A/K/A
GEORGE PARKS, III

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/01/2015 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF COUNT I, SEXUAL BATTERY, AND SENTENCED TO THIRTY YEARS; COUNT II, SEXUAL BATTERY, AND SENTENCED TO THIRTY YEARS; COUNT III, AGGRAVATED ASSAULT, AND SENTENCED TO TWENTY YEARS; COUNT IV, KIDNAPPING, AND SENTENCED TO THIRTY YEARS; AND COUNT V, POSSESSION OF A CONTROLLED SUBSTANCE, AND SENTENCED TO THREE YEARS; WITH THE SENTENCES IN COUNTS I AND II TO RUN CONSECUTIVELY TO ONE ANOTHER, AND WITH THE SENTENCES IN COUNTS III, IV, AND V TO RUN CONCURRENTLY WITH ONE ANOTHER AND CONCURRENTLY WITH THE SENTENCES IN COUNTS I AND II, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 02/07/2017 |

MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE GRIFFIS, P.J., BARNES AND CARLTON, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.    Pursuant to a multicount indictment, a Harrison County jury found George Parks guilty of two counts of sexual battery, one count of aggravated assault, one count of kidnapping, and one count of possession of a controlled substance.[1]  Parks now appeals his convictions and sentences.  On appeal, he asserts the following issues:[2]  (1) whether the circuit court erred by denying his motion to dismiss the indictment; (2) whether he was improperly arraigned; (3) whether his right to a speedy trial was violated; (4) whether the circuit court erred by denying his motion for new appointed counsel; (5) whether the circuit court erred by denying his motion to suppress evidence; (6) whether the circuit court erred by allowing the State to use evidence of his prior bad acts; (7) whether he was denied the right to a public trial; (8) whether his attorney provided ineffective assistance of counsel; (9) whether prosecutorial misconduct denied him a fair trial; (10) whether the circuit court erred by granting the State's proposed jury instruction S-6; and (11) whether the circuit court erred by denying his request for bail pending appeal.

¶2.    Finding no error, we affirm.

---

[1] *See* Miss. Code Ann. § 41-29-139(c)(1) (Rev. 2013); Miss. Code Ann. § 97-3-7(2)(a) (Rev. 2014); Miss. Code Ann. § 97-3-53 (Rev. 2014); Miss. Code Ann. § 97-3-95(1)(a) (Rev. 2014).

[2] The Indigent Appeals Division of the Office of State Public Defender filed an appellate brief on Parks's behalf.  Parks also filed his own supplemental appellate brief asserting additional issues.

**FACTS**

¶3.     On the evening of August 27, 2014, Officer Michael Warren of the Biloxi Police Department responded to a dispatch about a stabbing victim at Biloxi Regional Medical Center (now called Merit Health Hospital). Officer Warren proceeded to the hospital, where he interviewed the reported victim, Desiree Stringer, and photographed her injuries. Based on the information Stringer provided, officers were dispatched to Parks's residence.

¶4.     Along with others, Officer Bryan Wallace of the Biloxi Police Department responded to the dispatch to Parks's residence. Officer Wallace testified that Parks exited the residence and met the officers in the front yard. Officer Wallace stated that Parks had a large amount of dried and fresh blood on his left hand, and his right hand was swollen. Officer Wallace testified that he asked whether Parks had anything in his pockets that could cause harm. After Parks answered that he did not, Officer Wallace asked for permission to search Parks's pockets. Officer Wallace testified that Parks consented to the search. In Parks's shirt pocket, Officer Wallace discovered a plastic cellophane bag containing two off-white rocks. The jury later heard expert trial testimony that the two rocks were cocaine.

¶5.     Officer Wallace testified that he and another officer conducted a safety search of Parks's residence to ensure that no other victims, suspects, or persons needing medical attention were inside the home. Officer Wallace stated that the safety search lasted about two minutes. During the safety search of Parks's home, Officer Wallace observed marijuana cigarettes in plain view as well as a large amount of dried blood on the floor, the walls, and a bedroom mattress. After completing the safety search, Officer Wallace escorted Parks to the hospital to receive medical treatment for any possible injuries. Officer Wallace testified

3

that, during the car ride, Parks said a woman named "Paige" did his laundry and that she must have put the cocaine in his shirt pocket. The jury later heard trial testimony that one of the State's other witnesses, a woman named Tonda Adkisson, also went by the name of "Summer Paige Williams."

¶6. After obtaining a warrant, law enforcement performed a search of Parks's residence and collected evidence. Nathan Holly, an employee of the Mississippi Forensics Laboratory, testified as an expert in forensic DNA analysis. Holly testified that he performed a DNA analysis on blood swabbed from a knife found in Parks's residence and on blood swabbed from the back of Parks's left hand. According to Holly, each swab contained a DNA mixture of both Parks's and Stringer's blood.

¶7. The jury also heard testimony from Stringer. Stringer stated that she had known Parks for approximately four years and that the two had once worked for the same cab company. Stringer testified that she had even rented a room in Parks's house for several months about three years previously while she saved money to buy her own house. Stringer further testified that, on only one occasion about three-and-a-half to four years previously, she and Parks had been intimate.

¶8. At the time of the alleged incident in August 2014, Stringer lived in Bogalusa, Louisiana, with her mother. Stringer testified that she traveled to Biloxi, Mississippi, on August 25, 2014, to stay several nights at Parks's home and to hang out. Stringer stated that she intended to stay in Parks's guest bedroom. On the evening of August 26, 2014, Stringer testified that she and Parks went to pick up Adkisson, whom they both knew. Stringer testified that, upon arriving at Adkisson's home, she went inside to get Adkisson. Stringer

4

stated that Parks appeared irritated when the two women returned to the car. According to Stringer, Parks was irritated because they were not going to be able to stop by the liquor store before closing time.

¶9. Stringer further testified that, as she drove down the highway, Parks accused Adkisson of hitting him and calling him a derogatory name. However, Stringer stated that Adkisson did neither of these things. Stringer testified that Parks, who was sitting in the front passenger seat, turned around and began slapping and punching Adkisson, who was seated directly behind him. Stringer said that she pulled over and broke up the altercation. Stringer further stated that Parks then exited the car and began walking down the road. Stringer and Adkisson then drove back to Adkisson's house.

¶10. Stringer testified that she decided to collect her stuff from Parks's house and to then return to Adkisson's house to spend the night. However, Stringer stated that Parks was already at his house when she arrived. According to Stringer, Parks was angry and began asking Stringer questions about whether Adkisson was cheating on him, whether Adkisson loved him, and whether Adkisson loved Stringer more than him. Stringer testified that Parks did not like her responses and began making superficial cuts on her legs with a knife. Stringer further testified that Parks called her names and ordered her to stay at his house and answer his questions. In addition, Stringer said Parks threatened to cut off her hand if she moved.

¶11. Despite Parks's threats, Stringer said that she tried to run into the laundry room that adjoined Parks's bedroom. However, Stringer testified that Parks grabbed her by her hair, flung her to the ground, kicked her in the head three times, and cut her with the knife.

5

Stringer further stated that Parks dragged her back into his bedroom and made her sit on the bed. She said that he then placed a television in front of the door to prevent her from leaving the bedroom. Stringer testified that she also tried to hide underneath Parks's bed at one point. However, she said that Parks began to jump up and down on the bed and that he stabbed her with a broken golf club, which cut her face.

¶12. Stringer further testified that Parks said the cutting and the beating were really intended for Adkisson. At one point, Stringer said Parks thought he heard the police. Stringer stated that Parks made her sit on his lap while he held the knife to her throat. Stringer testified that Parks said he would slit her throat and kill her and then kill himself.

¶13. Although she had her clothes on when the altercation started, Stringer testified that Parks took her clothes off. Stringer testified that Parks said he was going to have sex with her since he could not have sex with Adkisson. Stringer testified that Parks grabbed her legs, and when she would not open her legs, he cut her on the back of her legs and on her bottom to force her to open her legs. Stringer stated that Parks then put his penis in her vagina. He then grabbed her by her hair and stuck his penis in her mouth. She testified that he said he would stab her in the top of her head if she bit him.

¶14. Overall, Stringer estimated that Parks held her against her will and assaulted her for seventeen to nineteen hours. She testified that Parks cut her all over her body, including her head, neck, arm, back, knees, ankles, legs, and hands. Toward the end of the ordeal, Stringer testified that Parks forced her to smoke methamphetamine. Stringer said Parks told her that she needed to smoke the methamphetamine to calm down. Stringer further testified that she began to notice she was no longer bleeding, and she thought she had become dehydrated.

6

Stringer stated that she eventually convinced Parks that she could get Adkisson to see him. Stringer testified that Parks then cleaned up, changed clothes, and brought her some clothes to wear.

¶15.    As they were driving to Adkisson's house, Stringer testified that Parks told her to just take him back to his house. Stringer testified that she refused to go back inside Parks's house and that he got out of the car and told her to do what she had to do. Stringer stated that she then drove immediately to the hospital.

¶16.    Jennifer Guice, an emergency-room nurse, testified that she was working on August 27, 2014, when Stringer arrived at the hospital. Guice testified that Stringer was very weak and required urgent medical attention. Stringer told Guice that she had been beaten, stabbed, kicked, punched, and held hostage. According to Guice, Stringer had bruises, scrapes, lacerations, and dried blood all over her body. Guice further testified that Stringer's injuries were consistent with those inflicted by a knife and a broken golf club.

¶17.    Dr. William Kennerly, the general surgeon who treated Stringer's wounds, testified that he closed thirty-three of the larger wounds on Stringer's body. Dr. Kennerly testified that the surgery lasted about an hour and a half, and then Stringer stayed in the hospital several days to recover. Dr. Kennerly stated that Stringer's injuries appeared consistent with knife wounds. He further stated that, in his expert opinion, not all of Stringer's wounds could have been self-inflicted.

¶18.    During its case-in-chief, the State presented testimony from two women—Kristin Cannata and Adkisson—who both stated that Parks had engaged in behavior toward them that was similar to the behavior alleged by Stringer. After both Cannata and Adkisson

7

testified, the circuit court instructed the jury that the State offered the testimony only to establish Parks's motive, intent, and modus operandi. The circuit court further instructed the jury that it should not consider the testimony to be substantive evidence in the allegations made by Stringer. The circuit court also reminded the jury that Parks was only on trial for the crimes alleged in the indictment and not for other acts.

¶19. Cannata testified about two past incidents involving Parks. Cannata stated that she had gone to high school with Parks and had known him for twenty-seven years. Cannata testified that, on September 24, 2010, Parks held her overnight against her will at his home in Biloxi. Cannata stated that, at the time, she and Parks were friends. Cannata testified that Parks became angry about some of her past relationships. According to Cannata, Parks took away her phone, hit her in the head and face, dragged her around by her hair, held a knife to her throat, and threatened to hit her with a hammer. Cannata also testified that she had sex with Parks during the incident because she felt that she had no other choice. On cross-examination, Cannata stated that the charges for this incident were dismissed.

¶20. Cannata testified that the second incident occurred at her home in Las Vegas, Nevada, on December 18, 2011, and that Parks again held her overnight against her will. Although she testified that she was struggling with the previous incident, Cannata admitted that Parks was an invited guest in her home. Cannata said that Parks became angry after her ex-husband came over to retrieve an item she had borrowed. According to Cannata, Parks hit her, pinned her on the bed, scraped scissors on her breasts and stomach, cut her stomach, punched her repeatedly in the ribs, and choked her. Cannata testified that Parks broke apart the scissors and used the blades like knives. Cannata further testified that Parks masturbated

8

on top of her while he had her pinned on the bed. On cross-examination, Cannata stated that, to the best of her knowledge, Parks faced a felony prosecution for the incident. She stated that she believed Parks took a plea deal and pled guilty to the charge in exchange for attending an anger-management class.

¶21. The State next called Adkisson to testify about Parks's past behavior toward her. Adkisson first corroborated Stringer's testimony that Parks hit Adkisson on the night of August 26, 2014. Adkisson claimed that she in no way provoked the attack. In addition, Adkisson testified about a previous incident where Parks assaulted her. Adkisson stated that she had lived in Parks's guest bedroom for a period of time. About two weeks after she moved out, Adkisson said she was collecting the remainder of her stuff from Parks's home when he took her phone, dragged her into his bedroom, choked her, ripped off her pants, and repeatedly smothered her with a pillow. Adkisson stated that Parks did not sexually assault her during the incident. Adkisson further testified that the incident lasted seventeen hours and that she never told the police because Parks threatened to harm her family, burn down her house, kill her animals, kill her, and then kill himself.

¶22. Adkisson admitted during questioning that she had previously been charged with and convicted of felony driving under the influence. Adkisson further admitted that, when she was younger, she had harmed herself by cutting her arms. In addition, Adkisson admitted that she had tried to commit suicide when she was younger. As previously stated, following both Adkisson's and Cannata's testimony, the circuit court instructed the jury on the purposes for which the testimony had been offered.

¶23. After the State completed its case-in-chief, Parks testified on his own behalf. During

9

direct examination, Parks testified that Adkisson had done his laundry and cleaned his house when she lived with him. Parks further testified that the cocaine Officer Wallace found in his shirt pocket was not his and that he did not know how the cocaine came to be in his shirt pocket. In response to questions asked during cross-examination, however, Parks testified that he told law enforcement that Adkisson must have put the cocaine in his shirt pocket when she did his laundry.

¶24. As to the allegations made by Stringer, Parks stated that he did accompany Stringer to pick up Adkisson on the evening of August 26, 2014. Parks testified that Adkisson called him a derogatory name, and he admitted that he turned around in the front seat of Stringer's car and hit Adkisson twice in the head and grabbed Adkisson's hair. According to Parks, he broke his right hand—his dominant hand—when he hit Adkisson.

¶25. In addition to admitting that he hit Adkisson on the evening of August 26, 2014, Parks admitted to the two past incidents involving Cannata. Parks admitted that, on each of the two occasions, he held Cannata overnight against her will. Parks corroborated Cannata's testimony that the first incident occurred at his home in Biloxi and that he threatened Cannata with a knife. Parks further admitted that the second incident occurred at Cannata's home in Las Vegas and involved him cutting Cannata with a pair of scissors.

¶26. Despite admitting to his past acts against Cannata, Parks denied that he assaulted Adkisson when she was moving out of his house. In addition, Parks repeatedly denied Stringer's allegations of sexual battery, aggravated assault, and kidnapping. With regard to Stringer's allegations, Parks testified that he never poked Stringer with a broken golf club or cut her with a knife. Parks further stated that he had never before seen the knife that law

10

enforcement found in his home. In addition, Parks testified that Stringer was free at all times to come and go from his house as she pleased.

¶27. Following the altercation with Adkisson in Stringer's car, Parks said that he exited the car and began to walk back to his house. He stated that he eventually hailed a taxi. Parks further testified that, by the time he arrived back at his house, Stringer was already there. Parks said that he heard a noise in the bedroom and walked in to find that Stringer had cut herself on the arms. Parks said that he also observed a glass pipe and a needle in the bedroom and knew that Stringer had a "habit." Parks testified that, after he walked into the bedroom, Stringer stuck him in the hand, leg, and toe with the knife she was holding. According to Parks, he saw cuts on Stringer's arms, legs, and back before she headed to the hospital. Parks testified that Stringer asked whether he wanted to accompany her to the hospital; however, Parks said he told Stringer that he would go to the hospital later.

¶28. The jury found Parks guilty of all five counts charged in his indictment. The circuit court then ordered Parks to serve the following sentences, all in the custody of the Mississippi Department of Corrections: (1) thirty years for Count I, sexual battery; (2) thirty years for Count II, sexual battery; (3) twenty years for Count III, aggravated assault; (4) thirty years for Count IV, kidnapping; and (5) three years for Count V, possession of a controlled substance. The circuit court further ordered the sentences in Counts I and II to run consecutively to one another and the sentences in Counts III, IV, and V to run concurrently with one another and concurrently with the sentences in Counts I and II.

¶29. Following his convictions and sentences, Parks filed an unsuccessful motion for a new trial or, in the alternative, a judgment notwithstanding the verdict. Aggrieved, Parks now

11

appeals his convictions and sentences to this Court. Parks's attorney from the public defender's office filed an appellate brief raising several claims of error, and Parks filed his own supplemental brief asserting additional issues. In our review, we address the claims of error raised by both Parks and his attorney on appeal.

## DISCUSSION

### I.  Motion to Dismiss the Indictment

¶30. The appellate courts apply de novo review to a trial court's grant or denial of a motion to dismiss. *Spencer v. State*, 880 So. 2d 1044, 1045 (¶6) (Miss. 2004). Here, Parks alleges that the circuit court should have dismissed his indictment because he was never personally served a copy. However, the record refutes Parks's assertions.

¶31. In pertinent part, Mississippi Code Annotated section 99-7-9 (Rev. 2015) states, "After the arrest of the person indicted, and prior to arraignment, a copy of the indictment shall be served on such person." The record reflects that Parks was indicted on March 23, 2015, and that on April 1, 2015, his attorney, Charlie Stewart, received service of the indictment on Parks's behalf. In addition, Parks admitted during the pretrial motion hearing on May 4, 2015, that the circuit-court clerk sent him a copy of his indictment after he requested the copy. The record also contains a copy of a letter Parks mailed to the circuit-court clerk, which was filed on April 30, 2015, in which Parks stated that he had received the requested copy of his indictment. Furthermore, in response to Parks's request during the May 4, 2015 hearing, the circuit court arraigned Parks, and Parks had his indictment read to him in open court before entering his plea to each count of his indictment.

¶32. Thus, upon review of this issue, we find the record fails to support Parks's assertions

that he never received personal service of a copy of his indictment. We therefore find no merit to Parks's argument that the circuit court erred by denying his motion to dismiss his indictment.

## II. Arraignment

¶33. In his appellate brief, Parks also appears to assert for the first time that he was not arraigned within thirty days of receiving his indictment. Rule 8.01 of the Uniform Rules of Circuit and County Court provides that "[a]rraignment, unless waived by the defendant, shall be held within thirty (30) days after the defendant is served with the indictment. . . . Arraignment is deemed waived when the defendant proceeds to trial without objection."

¶34. As previously discussed, Parks's attorney received service of the indictment on April 1, 2015. At the May 4, 2015 hearing, the circuit court noted that Parks had originally signed a waiver for his arraignment but had since decided to withdraw the waiver. Indeed, the record before us reflects that, in a letter filed with the circuit-court clerk on April 30, 2015, Parks informed the circuit court that he wished to formally withdraw his waiver of his arraignment. As a result of Parks's withdrawal of his waiver, the circuit court arraigned Parks during the May 4, 2015 hearing. In addition, the record reflects that Parks never raised an objection before the circuit court as to the timing of his arraignment. As a result, we find no merit to Parks's assertions for the first time on appeal.

## III. Right to a Speedy Trial

¶35. Parks also asserts that his constitutional right to a speedy trial was violated. Parks's "claim encompasses a fact question of whether the trial delay rose from good cause." *Rowsey v. State*, 188 So. 3d 486, 493 (¶18) (Miss. 2015) (citation omitted). We uphold the

trial court's decision when based on substantial credible evidence. *Id.* However, "[i]f no probative evidence supports the trial court's finding of good cause, [the appellate] [c]ourt will ordinarily reverse." *Id.* (citation omitted).

¶36. "The speedy-trial right attaches when an individual is accused." *Harris v. State*, 174 So. 3d 314, 318 (¶16) (Miss. Ct. App. 2015) (citation omitted). In addition to the constitutional right to a speedy trial, "Mississippi . . . guarantees a statutory right to a speedy trial, which requires [that] an accused be brought to trial within 270 days of arraignment unless there is a showing of good cause." *Id.* (citation and internal quotation marks omitted). To analyze a speedy-trial claim, we must consider the following factors, which we apply on a case-by-case basis: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

### A. Length of the Delay

¶37. "For speedy-trial purposes, a delay of eight (8) months or more is presumptively prejudicial." *Harris*, 174 So. 3d at 318 (¶19) (citation omitted). Parks was arrested on August 27, 2014. Almost eleven months later, at the September 22, 2015 pretrial hearing, the circuit court heard Parks's motion to dismiss for lack of a speedy trial. Because this delay was over eight months, a presumption of prejudice arose. We must therefore consider the remaining three factors to determine whether the delay violated Parks's right to a speedy trial. *See id.* at 319 (¶19).

### B. Reason for the Delay

¶38. "When the delay is presumptively prejudicial, the burden shifts to the State to show

14

cause for the delay. This requires that we decide if the delay should be charged to the State or [the] defendant." *Id.* at (¶20) (internal citation omitted). In ruling on Parks's speedy-trial motion, the circuit court found that Parks was arraigned on May 4, 2015, and that his trial was then originally scheduled for less than three months later on July 27, 2015. The circuit court stated that, "given the heavy docket in this district, . . . the multiple counts against [Parks], the workload of the public defender's office, and . . . Stewart's involve[ment] with other clients, this [original] trial date was not unreasonable." In addition, the circuit court noted that Parks neither requested an earlier trial date nor objected to his initial trial date.

¶39. The circuit court next found that Parks's trial was rescheduled due to a pro se motion that Parks filed on June 29, 2015, about a month before his trial. In his pro se motion, Parks sought to discharge Stewart and to be appointed new counsel. The circuit court found that Parks's motion was heard on July 28, 2015, the day after his initial trial date, at which time the circuit court denied the motion. According to the circuit court's findings, even if Stewart had been discharged at the time Parks filed the motion on June 29, 2015, insufficient time would have existed for substitute counsel to be appointed and to adequately prepare for trial the next month on July 27, 2015.

¶40. The circuit court further found that the delay between Parks's arrest and his first trial date on July 27, 2015, was not so lengthy or prejudicial as to require dismissal. The circuit court also concluded that the additional delay in Parks's trial was attributable to Parks's pro se filing seeking the appointment of new counsel. In addition, the circuit court found that, at the July 28, 2015 hearing on Parks's motion for new appointed counsel, no objection was made to the rescheduling of the trial. Based on its findings, the circuit court concluded the

15

delay in Parks's trial was not unreasonable. The circuit court therefore determined that this factor weighed against Parks.

### C. Parks's Assertion of His Right

¶41. The circuit court acknowledged that Parks had asserted his right to a speedy trial on multiple occasions. The circuit court therefore concluded that this factor weighed in Parks's favor.

### D. Prejudice to Parks

¶42. In *Harris*, this Court stated:

> Under *Barker*'s prejudice prong, the three relevant interests are "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Of these three, the most serious is the final one, since a defendant's inability to adequately prepare his case "skews the fairness of the entire system."

*Harris*, 174 So. 3d at 320 (¶28) (quoting *Barker*, 407 U.S. at 532).

¶43. On appeal, Parks claims that he has suffered prejudice under all three relevant interests of this prong. He contends that his pretrial detention was oppressive; that he has suffered from anxiety and experienced weight loss; and that his incarceration prevented him from collecting evidence for his trial.

¶44. In *Harris*, this Court recognized that, though the defendant's "pretrial incarceration was no doubt lengthy, [his] 'incarceration alone does not constitute prejudice.'" *Id.* at (¶29) (quoting *Johnson v. State*, 68 So. 3d 1239, 1245 (¶17) (Miss. 2011)). As to Parks's claim of anxiety and weight loss, this Court also noted in *Harris* that, "for this prong to favor any defendant, evidence of legitimate anxiety and concern (medical records, documentation from the jail, etc.) must exist." *Id.* at (¶30) (quoting *Johnson*, 68 So. 3d at 1245 (¶17)). However,

16

in the present case, Parks fails to present any evidence to support his claim of anxiety-based prejudice, and we decline to "speculate about the nature of his supposed anxiety." *Id.* We therefore turn our focus to Parks's assertion that his incarceration impaired his defense.

¶45.    The possibility that a delay in Parks's trial impaired his ability to adequately prepare his case is the most important concern in our determination of whether Parks suffered prejudice. *See id.* at (¶31). "Generally, proof of prejudice beyond incarceration may include such matters as the loss of evidence, death of witnesses, or staleness of the investigation." *Id.* (quoting *Moore v. State*, 837 So. 2d 794, 799 (¶13) (Miss. Ct. App. 2003)).  Although Parks alleges that his incarceration prevented him from collecting evidence for his trial, the circuit court found no merit to the claim.  In addressing Parks's contention, the circuit court stated:

> The main thrust of [Parks's] argument was that[,] because he was in jail, . . . he's been prevented from obtaining evidence from his home and getting some video evidence from a gas station here in Biloxi.  The difficulty the court sees here is that [Parks] is bringing these issues pro se while he is represented by counsel, and these issues are brought somewhat outside of [his] counsel's trial strategy.

¶46.    The circuit court also found Parks's claims of lost evidence were speculative. According to the circuit court, Parks failed to support his contention that evidence from his home disappeared during his incarceration.  The circuit court stated that Parks also failed to offer any "evidence to support the claim that there was indeed some type of evidence . . . which would be exculpatory . . . or which would be useful in his trial . . . ."  Because the record before us reflects that Parks failed to offer any evidence to prove his assertions of an impaired defense, we find this factor weighs against Parks.

17

¶47. After considering each of the relevant factors, the circuit court concluded under the totality of the circumstances that Parks suffered no deprivation of his constitutional or statutory right to a speedy trial. Upon review, we find the record contains substantial credible evidence to support the circuit court's decision and its subsequent denial of Parks's motion to dismiss for lack of a speedy trial. *See Rowsey*, 188 So. 3d at 493 (¶18). As discussed, the record reflects that Parks never objected to his initial trial date, and the additional delay in his trial was attributable to his pro se motion to replace his trial counsel. In addition, Parks failed to show that the delay in his trial prejudiced him. We therefore find that this assignment of error lacks merit.

### IV. Motion for New Appointed Counsel

¶48. Parks also asserts on appeal that the circuit court erred by denying his motion to appoint new counsel. As our caselaw acknowledges, "[a]n accused has the right to effective counsel but not to appointed counsel strictly of his own choosing. When a defendant seeks to have his appointed counsel removed, the sound discretion of the trial judge is invoked." *Wilson v. State*, 821 So. 2d 911, 914 (¶10) (Miss. Ct. App. 2002) (internal citations omitted).

¶49. During the pretrial hearing on his motion for new appointed counsel, Parks alleged that his attorney, Stewart, had failed to sufficiently communicate with him about his case. Parks further asserted that Stewart had not subpoenaed certain individuals or requested certain business records like Parks had asked. Without revealing his trial strategy or any privileged information, Stewart informed the circuit court that he had visited and communicated with Parks about the case. Stewart also explained that he had previously discussed with Parks any issues related to Parks's requests for subpoenas and business

18

information.

¶50. Stewart acknowledged that Parks had filed several bar complaints against him. He also stated that Parks "typically [did not] want to hear [his] thoughts" on the issues because he and Parks disagreed. Despite the differences in opinion and the bar-complaint filings, Stewart informed the circuit court of his belief that nothing had transpired to require his removal from the case. Stewart stated that he had "dealt with individuals in this situation many, many times." Stewart further explained that he knew Parks's case, had discussed the case and its issues with Parks, and had given Parks all the discovery he had received from the State. After hearing from both Parks and Stewart, the circuit court found that Stewart was a competent attorney who had done nothing detrimental to Parks's case. As a result, the circuit court denied Parks's motion to appoint new counsel.

¶51. Upon review, we find no abuse of discretion in the circuit court's denial of Parks's motion. *See Wilson*, 821 So. 2d at 914 (¶10). The record reflects that the circuit court considered the facts and arguments presented before finding that Parks suffered no prejudice by proceeding to trial with Stewart as his appointed attorney. Although the record reflects that Stewart and Parks disagreed over trial strategy, our caselaw clearly establishes that trial strategy is left to the attorney's sound discretion. *See Nichols v. State*, 27 So. 3d 433, 443 (¶36) (Miss. Ct. App. 2009). Based on a review of the record and relevant caselaw, we find no merit to Parks's argument regarding this issue.

### V. Motion to Suppress

¶52. Prior to trial, Parks moved to suppress the evidence collected by law enforcement after they obtained a search warrant. Parks contends on appeal that officers conducted an illegal

19

safety search incident to his arrest, and he argues that any evidence subsequently collected constituted fruit of the poisonous tree. As a result, Parks asserts that the circuit court erred by denying his motion to suppress the evidence.

¶53. "In reviewing the denial of a motion to suppress, [the appellate court] must determine whether the trial court's findings, considering the totality of the circumstances, are supported by substantial credible evidence. Where supported by substantial credible evidence, [the appellate court] shall not disturb those findings." *Moore v. State*, 933 So. 2d 910, 914 (¶9) (Miss. 2006) (internal citations omitted). "The standard of review for the admission or suppression of evidence is abuse of discretion." *Green v. State*, 183 So. 3d 78, 80 (¶3) (Miss. Ct. App. 2015) (citation omitted).

¶54. "The Fourth Amendment protects 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Id.* at (¶4) (quoting U.S. Const. amend. IV). "As a general rule, warrantless searches of private property are per se unreasonable." *Jordan v. State*, 995 So. 2d 94, 107 (¶37) (Miss. 2008) (citation omitted). However, "[a] warrantless search is permissible in certain exigent circumstances if it can be shown that grounds existed to conduct the search that, had time permitted, would have reasonably satisfied a disinterested magistrate that a warrant should properly issue." *Vaughn v. State*, 972 So. 2d 56, 61 (¶18) (Miss. Ct. App. 2008) (citation omitted).

¶55. In the present case, the circuit court found during the pretrial suppression hearing that, almost contemporaneously with receiving Officer Warren's report about Stringer's statement, law enforcement responded to Parks's home. The circuit court further found that, upon arriving at Parks's home, officers encountered Parks in his front yard. Officer Wallace

20

testified that he observed fresh blood on Parks, which the circuit court found indicative of a recent event. Officer Wallace further stated that, after securing Parks in front of his home, he and another officer conducted a safety sweep of the residence while a third officer remained with Parks. Officer Wallace testified that the sweep, which took less than two minutes, was to determine whether there was anyone else in the residence, such as victims, assailants, or those needing medical attention. Based upon the totality of the circumstances, the circuit court found the safety search of Parks's home was constitutionally permissible and was justified under the exigent-circumstances exception.

¶56. Because the evidence in the record contains substantial credible evidence to support the circuit court's findings on this issue, we find no error in the circuit court's ruling that the safety search was permissible due to exigent circumstances. *See Michigan v. Fisher*, 558 U.S. 45, 47-49 (2009) (discussing the exigent-circumstances exception). We further find no abuse of discretion in the circuit court's denial of Parks's motion to suppress the evidence discovered as a result of the search. Thus, this assignment of error lacks merit.

### VI. Prior Bad Acts

¶57. Parks argues that the circuit court erred by admitting evidence of his prior bad acts. Parks asserts that Cannata's and Adkisson's testimony about his prior bad acts was inadmissible character evidence that unfairly prejudiced him. He therefore asks this Court to reverse his convictions and sentences and to remand the case for a new trial.

¶58. As previously stated, we review the circuit court's admission of evidence for abuse of discretion. *Stone v. State*, 94 So. 3d 1078, 1081 (¶9) (Miss. 2012). "Although a judge has broad discretion in admitting evidence, evidence of a crime other than the one for which the

21

accused is being tried generally will not be admissible." *See Hargett v. State*, 62 So. 3d 950, 953 (¶8) (Miss. 2011) (citations omitted). Before admitting any evidence of a defendant's prior bad acts, the circuit court must find (1) the evidence is offered for a permissible purpose under Rule 404(b) of the Mississippi Rules of Evidence, and (2) the evidence's probative value outweighs its prejudicial effect under Rule 403 of the Mississippi Rules of Evidence. *Welde v. State*, 3 So. 3d 113, 117 (¶15) (Miss. 2009).

¶59. Prior-bad-acts evidence is inadmissible to prove the defendant's character to show that he acted in conformity therewith. M.R.E. 404(b)(1). However, such evidence may be admissible if offered for some other permissible purpose, such as proof of the defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." M.R.E. 404(b)(2); *see also Welde*, 3 So. 3d at 117 (¶15) (discussing the two-pronged test for determining whether prior-bad-acts evidence is admissible under Rules 403 and 404(b)).

¶60. In the present case, the State made a pretrial motion pursuant to Rule 404(b) to admit Cannata's and Adkisson's testimony about Parks's prior bad acts. The State sought to admit Cannata's and Adkisson's testimony about several different incidents where Parks held the women against their will, assaulted them, and threatened them. Upon hearing arguments on the motion, the circuit court found that the State sought to admit the evidence for the specific purposes of showing Parks's motive, intent, and modus operandi. In discussing the State's motion, the circuit court found the State only wished to introduce the evidence for these three limited purposes and was not trying to use a "shotgun approach" to admit the evidence. The circuit court further stated that, although Rule 404(b) fails to specifically list modus operandi

as an exception, this was "a legitimate and judicially recognized purpose." *See Fisher v. State*, 532 So. 2d 992, 999-1000 (Miss. 1988) (holding that evidence of the defendant's modus operandi was admissible under Rule 404(b)).

¶61. The circuit court found that the State's proffered evidence alleged that Parks was at one time friends with the reported victims, who were both female. The proffered evidence further provided that Parks held the women against their will at a time when the women were alone with Parks. The evidence showed that Parks physically assaulted the women by using his hands and feet and that he did not allow the women to leave the place where the assault occurred. Furthermore, the circuit court found the proffered evidence tended to show that, if sexual abuse occurred, it occurred by force, and if no such abuse occurred, it was an acquiescence by Parks due to the fear of the alleged victim. The circuit court also found the evidence showed that Parks used a knife or other sharp object to threaten or harm his victims. Based on these similarities, the circuit court found that the facts were substantially similar in each incident. The circuit court further determined that the evidence was admissible under Rule 404(b) to show Parks's motive, intent, and modus operandi.

¶62. After finding the evidence was admissible under Rule 404(b), the circuit court next considered whether, under Rule 403, the evidence's probative value substantially outweighed the danger of unfair prejudice to Parks. The circuit court stated:

> Based upon the . . . proffer I've heard, the court does not find this evidence to be substantially outweighed by the danger of unfair prejudice. In fact, the similarities of these cases in my mind [do] not create any unfair prejudice, but provide[] relevant admissible evidence, both under [Rules] 404(b) and 403, and the court will allow that [Rule] 404(b) testimony that I've heard by way of proffer into the record, and [the court] will provide, without it being asked for, a proper limiting instruction to the jury.

23

¶63. The record reflects that the circuit court followed the proper two-pronged analysis to determine whether the evidence was "relevant to prove a material issue other than the defendant's character" and whether the evidence's "probative value . . . outweigh[ed] the prejudicial effect." *Welde*, 3 So. 3d at 117 (¶15) (citation omitted). Because the circuit court considered the evidence's admissibility under Rule 404(b) and then filtered the evidence through Rule 403's balancing test, we find no abuse of discretion by the circuit court's decision to admit the evidence. As a result, this issue lacks merit.

### VII. Right to a Public Trial

¶64. "The Sixth Amendment to the United States Constitution and Article 3, Section 26 of the Mississippi Constitution guarantee a defendant the right to a public trial." *Lewis v. State*, 140 So. 3d 1290, 1293-94 (¶13) (Miss. Ct. App. 2014). Parks claims his right to a public trial was violated when his friend, Amber Andrews, was escorted out of the courtroom. However, the record fails to support Parks's assertions underlying this assignment of error.

¶65. During Parks's trial, the circuit court conducted a hearing outside the jury's presence that included the following discussion:

| | |
|---|---|
| The Court: | [S]heriffs, do you all know who that person was that came through the courtroom and created the disturbance . . . ? |
| Deputy John Kelly: | After I got her out the door[,] she claimed that she's known [Parks] for a while[,] and she didn't appreciate what he is going through. She was trying to speak to his attorney. |
| The Court: | Do you anticipate her coming back, wanting to come back to the courtroom? |
| Mr. Damion Reese: | Judge, she's been advised by me not to come in the |

24

|  |  |
|---|---|
|  | courtroom. She said her name was Amber. She said she is a friend of . . . Parks. She said she read and saw some stuff in the paper[,] and it disturbed her[,] and she said that . . . Parks wasn't like that. I advised her . . . , after the sheriff had advised her, that she could not be disrupting the courtroom. She did say she wanted to speak with Mr. Stewart[, Parks's attorney]. I told her she had to wait out there[,] and . . . she wanted to leave her number. I said[,] if you did, he probably wouldn't be able to call you until after trial. So if you wanted to have a seat, at some break or point in time[,] he may be able to speak to you, I don't know. But she is not coming back in the courtroom. |
| The Court: | The court's observation was that she walked down the aisle of the courtroom with stride and strut that was disruptive to me, and I suspect to the . . . jurors, and when I made eye contact with her, she waved at me like I knew who she was[,] and she was trying to make contact with defense counsel, and [she] moved about the courtroom rather disruptively. And I think [she] moved a time or two again before she voluntarily left and was escorted finally out by some security. So I think she was disruptive, and I want the record to reflect that. In the instance you see her and she wants to come back in, she is to remain out[side] until I can have a word with her outside the presence of the jury. As it relates to her involvement and wanting to discuss anything with [the] defense, that's as between them. |

¶66. Thus, the record reflects that Andrews was not kicked out of the courtroom as Parks now contends but that she left of her own accord after creating a disruption. Furthermore, the record fails to reflect that the circuit court excluded any member of the public, including Andrews, from attending Parks's trial. As our precedent recognizes, "[t]he term 'public trial' contemplated by our Federal and State Constitutions is a trial [that] is not secret and one that the public is free to attend. To a great extent[,] it is a relative term[,] and its meaning depends largely on the circumstances of each particular case." *Norwood v. State*, 258 So. 2d

25

756, 763 (Miss. 1972) (citation omitted). Furthermore, the Mississippi Supreme Court has held that the exclusion of one person from the courtroom does not violate the defendant's right to a public trial. *Young v. State*, 352 So. 2d 815, 818 (Miss. 1977). The record here fails to support Parks's contention that the circuit court denied him a public trial. We therefore find that this argument lacks merit.

### VIII. Ineffective Assistance of Counsel

¶67. Parks also argues that his attorney rendered ineffective assistance of counsel. To prevail on his claim of ineffective assistance of counsel, Parks must show that (1) his attorney's performance was deficient, and (2) the deficiency prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶68. Parks's assertions surround his attorney's alleged failure to interview or to call a potential defense witness. However, Parks fails to show what, if any, relevant testimony the potential witness could have offered in his case. In addition, Parks fails to show that his attorney, Stewart, rendered a deficient performance or that he, Parks, was prejudiced by any such alleged deficiency. As a result, we find that Parks fails to meet either prong of the *Strickland* test. This issue therefore lacks merit.

### IX. Prosecutorial Misconduct

¶69. Parks's argument in support of this assignment of error pertains to the State's closing argument. Parks contends that the State exceeded the facts in evidence, and he argues the State's closing was inflammatory. However, Parks did not raise any objection to the State's closing argument at trial. As a result, this issue is procedurally barred and is not properly before this Court for review. *See Pruitt v. State*, 122 So. 3d 806, 809 (¶10) (Miss. Ct. App.

26

2013) (stating that the failure to raise a contemporaneous objection waives an issue for appeal). We therefore decline to address this issue.

## X. Jury Instruction S-6

¶70. Parks further asserts that the circuit court erred by granting jury instruction S-6. Instruction S-6 stated, "The [c]ourt instructs the jury that the uncorroborated testimony of a sex-crime victim is sufficient to support a conviction if accepted as true by the finder of fact." We review the circuit court's grant of a proposed jury instruction for abuse of discretion. *Quinn v. State*, 191 So. 3d 1227, 1231-32 (¶18) (Miss. 2016). In addition, we review the jury instructions as a whole, and where they "fairly announce the law of the case and create no injustice," we will find no reversible error. *Id.* at 1232 (¶18) (citation omitted).

¶71. Here, jury instruction S-6 did not comment on the weight of the evidence or tell the jury how to weigh the credibility of Stringer's testimony. Nor did the instruction mention any aspect of Stringer's testimony relative to a determination of credibility. *Compare Bester v. State*, 212 Miss. 641, 646, 55 So. 2d 379, 380 (1951) (finding that a granted jury instruction was objectionable because the instruction commented on the weight of the evidence and singled out and gave undue emphasis and prominence to certain portions of a witness's testimony). Instead, instruction S-6 simply conveyed to the jury that, if they found Stringer's testimony true, even if no corroborating evidence existed, they could find that the testimony supported Parks's conviction. *See Lee v. State*, 242 Miss. 97, 106, 134 So. 2d 145, 149 (1961) (stating that a rape victim's evidence was sufficient to sustain a conviction without corroboration where the testimony was "consistent with the surrounding circumstances and conditions shown by the evidence" (citations omitted)). Furthermore, jury

27

instructions S-1 and S-2 informed the jury that they were to consider the evidence to determine whether the State proved that Parks committed the crimes charged beyond a reasonable doubt.

¶72. Based upon a review of the record and Mississippi precedent, we find no abuse of discretion in the circuit court's grant of jury instruction S-6. As a result, we find this assignment of error lacks merit.

### XI. Request for an Appeal Bond

¶73. Parks next argues that the circuit court erred by denying his request for an appeal bond. In November 2015, Parks first sought release pending the outcome of his appeal. The circuit court denied Parks's request on November 20, 2015. As required by statute, the circuit court placed in the record its reasons for denying Parks's appeal bond. *See* Miss. Code Ann. § 99-35-115(2)(b) (Rev. 2015). In its order, the circuit court stated the following:

> Parks has not shown by clear and convincing evidence that his release "would not constitute a special danger to any other person or to the community . . . and that a condition or a combination of conditions may be placed on release that will reasonably assure [his] appearance . . . as required. . . ." Further, at his sentencing hearing, the [c]ourt determined that Parks is a special danger to the victim in this case. Moreover, the peculiar circumstances of the extremely violent nature of this case, in this [c]ourt's opinion, render postconviction bail wholly inappropriate.

(Quoting Miss. Code Ann. § 99-35-115(2)(a) (Rev. 2015)).

¶74. This Court reviews a trial court's denial of an appeal bond for abuse of discretion. *Woods v. State*, 965 So. 2d 725, 731 (¶18) (Miss. Ct. App. 2007). Here, the circuit court followed the statutory requirements of section 99-35-115 in evaluating Parks's request for an appeal bond. The circuit court found that Parks failed to prove that his release would not

28

constitute a special danger to another person or to the community. In addition, the circuit court noted its previous finding that Parks represented a special danger to Stringer. The record supports the circuit court's findings, and we therefore find no abuse of discretion. Thus, this assignment of error lacks merit.

¶75. **THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT, OF CONVICTION OF COUNT I, SEXUAL BATTERY, AND SENTENCE OF THIRTY YEARS; COUNT II, SEXUAL BATTERY, AND SENTENCE OF THIRTY YEARS; COUNT III, AGGRAVATED ASSAULT, AND SENTENCE OF TWENTY YEARS; COUNT IV, KIDNAPPING, AND SENTENCE OF THIRTY YEARS; AND COUNT V, POSSESSION OF A CONTROLLED SUBSTANCE, AND SENTENCE OF THREE YEARS; WITH THE SENTENCES IN COUNTS I AND II TO RUN CONSECUTIVELY TO ONE ANOTHER, AND WITH THE SENTENCES IN COUNTS III, IV, AND V TO RUN CONCURRENTLY WITH ONE ANOTHER AND CONCURRENTLY WITH THE SENTENCES IN COUNTS I AND II, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**